UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN LUIS & DELTA-MENDOTA WATER AUTHORITY and WESTLANDS WATER DISTRICT,<br><br>Plaintiffs,<br><br>v.<br><br>SALLY JEWELL, as Secretary of the U.S. Department of the Interior; U.S. DEPARTMENT OF THE INTERIOR; U.S. BUREAU OF RECLAMATION; MICHAEL L. CONNOR, as Commissioner, Bureau of Reclamation, U.S. Department of the Interior; and DAVID MURRILLO, as Regional Director, Mid-Pacific Region, Bureau of Reclamation, U.S. Department of the Interior,<br><br>Defendants,<br><br>THE HOOPA VALLEY TRIBE; PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS; and INSTITUTE FOR FISHERIES RESOURCES,<br><br>Defendant-Intervenors. | CASE NO. 1:13-CV-01232-LJO-GSA<br><br>MODIFIED TEMPORARY RESTRAINING ORDER EXTENDING INJUNCTION THROUGH AUGUST 23, 2013 AND SETTING PRELIMINARY INJUNCTION HEARING FOR AUGUST 21, 2013. |

## I. INTRODUCTION

Plaintiffs have moved for a temporary restraining order and preliminary injunction, seeking to enjoin Federal Defendants from making certain "flow augmentation" releases of water from Trinity Reservoir beginning on August 13, 2013. Docs. 14 & 16. The stated purpose of the planned releases is to "reduce the likelihood, and potentially reduce the severity, of any Ich epizootic event that could lead to associated fish die off in 2013" in the lower Klamath River. Doc. 25-3 at 1.

On August 12, 2013, this Court issued a Temporary Restraining Order ("TRO") enjoining Federal Defendants from implementing the flow augmentation until Friday, August 15, 2013, to provide additional time to evaluate the parties' positions. Doc. 57. Having had additional time to consider the

1

materials filed thus far, the Court concludes that an extension of the TRO to afford an opportunity for an expedited hearing on Plaintiffs' motion for preliminary injunction is warranted.

## II. STANDARD OF DECISION

In order to secure injunctive relief prior to a full adjudication on the merits, a plaintiff must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id*. at 22.

## III. DISCUSSION

A.  **Likelihood of Success on the Merits.**

Plaintiffs argue that Federal Defendants lack legal authority to make the planned flow augmentation releases and therefore that Plaintiffs are entitled to relief under the Administrative Procedure Act ("APA"), which provides that a reviewing court shall "hold unlawful and set aside agency action ... found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ... (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2). Specifically, Plaintiffs argue that implementing the flow augmentation will:

(1) violate Federal Defendants' mandatory duty under Central Valley Project Improvement Act ("CVPIA") § 3406(b)(23), Pub. L. No. 102-575, 106 Stat. 4600, because the planned flows exceed those permitted in the Record of Decision for Trinity River Mainstem Fishery Restoration ("TRROD") called for in § 3406(b)(23);

(2) violate CVPIA § 3411(a) and 43 U.S.C. § 383 because Federal Defendants failed to obtain an amendment to the approved place of use of the water that will be released pursuant to the flow augmentation plan; and

(3) violate the National Environmental Policy Act, ("NEPA"), 42 U.S.C. § 4321 *et seq*., because

2

Federal Defendants failed to engage in a sufficiently robust evaluation of the flow augmentation's environmental impacts.

### 1. CVPIA § 3406(b)(23).

CVPIA § 3406(b)(23) directs the Secretary of the Interior to maintain certain minimum instream flows in the Trinity River "to meet Federal trust responsibilities to protect the fishery resources of the Hoopa Valley Tribe, and to meet the fishery restoration goals of the Act of October 24, 1984, Pub. L. 98-541." From 1992-1996, section 3406(b)(23) set a default minimum instream flow at "not less than 340,000 acre-feet per year," with the further instruction that this default minimum flow could be increased based upon a flow evaluation study and with the concurrence of the Hoopa Valley Tribe. Following completion of the flow evaluation study, the Department of the Interior initiated an environmental review process to develop and assess alternatives to restore the Trinity River. *See* 59 Fed. Reg. 27,060-02 (June 17, 1992). As part of this process, the Secretary issued a draft environmental impact statement ("EIS") pursuant to NEPA. *See id*. Following public comment, the Secretary issued the TRROD. Doc. 25-1.

Among other things, the TRROD sets forth the volume of water to be released to provide instream flows below Lewiston Dam on the Trinity River in various water year types. Doc. 25-1 (TRROD) at 12. It also clearly indicates that while "the schedule for releasing water on a daily basis … may be adjusted … the annual flow volumes … may not be changed." *Id*. The implication of this language is that the flow volumes set forth in the TRROD are <u>maximums</u>, as well as minimums. This implication is further supported by the fact that the TRROD itself discusses numerous environmental impacts that could result from the use of the respective flow in the Trinity River, as opposed to transferring some of that flow (as was historically done) to the Sacramento/San Joaquin basin. *Id*. at 19-24. The more water dedicated to instream uses, the greater those impacts would be.

Federal Defendants and Defendant Intervenors point to authorities that suggest Federal Defendants nevertheless have discretion to provide additional flows for fish and wildlife restoration below the confluence of the Trinity and Klamath Rivers. For example, Section 2 of the 1955 Trinity

3

River Division Central Valley Project Act, Pub. L. No. 84-386, 69 Stat. 719, provides general authorization to integrate the Trinity River Division with other features of the Central Valley Project, provided that the Secretary "is authorized and directed to adopt appropriate measures to insure the preservation and propagation of fish and wildlife, including, but not limited to the maintenance of the flow of the Trinity River below the diversion point at not less than one hundred and fifty cubic feet per second ...." An interpretive opinion issued by the Solicitor of the Department of the Interior in 1979 concluded that this language required that the instream flow needs of the Trinity Basin must be met first prior to exporting water to the Central Valley. Memorandum from the Solicitor to Assistant Secretary – Land and Water Resources, *Proposed Contract with Grasslands Water District* (Dec. 7, 1979), Doc. 51-3 (Krulitz Opinion).

In 1984, Congress passed the Trinity River Basin Fish and Wildlife Management Act, Pub. L. No. 98-541, 98 Stat. 2721, which directed the Secretary to implement a management program "for the Trinity River Basin designed to restore the fish and wildlife populations ... to the levels approximating those which existed immediately before the start of construction [of the Trinity River Division] and to maintain such levels." *Id*. at § 2.

As discussed above, the 1992 CVPIA set a default minimum flow requirement for the Trinity River, while permitting increased instream flows after consultation with the Hoopa Valley Tribe. CVPIA § 3406(b)(23). In addition, the CVPIA listed among its purposes "to protect, restore, and enhance fish, wildlife, and associated habitats in the Central Valley and Trinity River Basins." CVPIA § 3402(a).

In arguing that the pre-CVPIA authorities provide discretion to make releases above and beyond the flow regime adopted in the TRROD, all Defendants attempt to draw a distinction between restoration activities on the mainstem of the Trinity River and restoration activities aimed at fish moving through the other parts of the Klamath Basin, including the stretch of the Klamath River between its confluence

with the Trinity and the ocean.[1] Defendants assert Federal Defendants maintain discretion to implement the flow augmentation for this latter purpose. Yet, all of the authorities discussed above focus on the Trinity River and do not clearly authorize restoration flows elsewhere. The culmination of Congressional activity to restore the Trinity was the CVPIA and its associated TRROD, which, after environmental review, set up a regime for restoring the Trinity River Fishery. As discussed above, this regime appears to set a maximum, as well as a minimum, for instream flow releases.

Defendants do point out, correctly, that Federal Defendants have a trust responsibility to the various Indian tribes that rely upon the fish populations in question. Both the Hoopa Valley and Yurok Tribes have federally protected fishing rights in the Trinity and Klamath Rivers. *See generally Blake v. Arnett*, 663 F.2d 906 (9th Cir. 1981). In 1981, the Secretary of the Interior issued a decision indicating that the Secretary's trust responsibilities to the Hoopa and Yurok Indian tribes, combined with other federal laws, required the restoration of the river's salmon and steelhead populations to "pre-project levels." Secretarial Issue Document, Trinity River Fishery Mitigation (Jan. 14, 1981), Doc. 51-4. In 1993, Solicitor Leshy issued a published opinion, which addressed the Tribes' rights to a share of the Klamath Basin's anadromous fishery resources. United States Department of the Interior, Office of the Solicitor, M-36979, Fishing Rights of the Yurok and Hoopa Valley Tribes (Oct. 3, 1993), 1993 WL 13564018. The Opinion concluded:

> The Secretary of the Interior has acted in the past to increase flows in the Trinity River, in part to improve the fishery for the benefit of the Indians. This was a recognition that protection of the fishery itself is necessary to make the tribal fishing right meaningful. In order for both the purpose of the reservations and the objectives of the Magnuson Act to be fulfilled, the fishery resource here must be rebuilt to sustain a viable fishery for all user groups, consistent with sound conservation practices....
>
> ***
>
> As a general matter, all parties that manage the fishery, or whose actions affect the fishery, have a responsibility to act in accordance with the fishing rights of the Tribes. This may go beyond safeguarding their right to an appropriate share of the harvest on their reservations, ... to include a viable and adequate fishery from which to fulfill the Tribes' rights, whether those rights are fulfilled by a 50% share or by a lesser amount, if a

---

[1] The Trinity River is a tributary to the Klamath River, which in turn reaches the ocean near Klamath, California

> lesser amount will satisfy fully the moderate living standard to which the Tribes are entitled.

*Id*. at *16.

But, again, the subsequent CVPIA and TRROD appear to be, at least in part, aimed at addressing these trust responsibilities. The Leshy opinion acknowledges as much, citing the CVPIA § 3406(b)(23) instream flow directive. *Id*. at *15. Moreover, as the Leshy opinion summarizes, a Tribe's fishing right is a "right to take a share of each run of fish that passes through tribal fishing areas." *Id*. While there is certainly support for an agency decision to operate a water project to satisfy Tribal rights, *see Klamath Water Users Ass'n v. Patterson*, 15 F. Supp. 2d 990, 996 (D. Or. 1998) aff'd sub nom., 204 F.3d 1206 (9th Cir. 1999) opinion amended on denial of reh'g, 203 F.3d 1175 (9th Cir. 2000) (upholding operation of Klamath project to meet senior Indian water rights prior to delivering water to irrigators), it is not at all clear how the Tribal fishing rights doctrine should be applied in this case. Does it provide an open-ended exception to limits otherwise provided by law?

### 2. **Change of Place of Use.**

Plaintiffs next argue that the flow augmentation would violate the water rights permit Reclamation holds for the Trinity River Division, asserting Reclamation was required to obtain permission to change the place of use of the water from the California State Water Resources Control Board ("SWRCB"). Federal law requires Reclamation to follow state law as to the control, appropriation, use, or distribution of water used in irrigation and to obtain state-issued water rights permits for its projects. 43 U.S.C. § 383; *California v. United States*, 438 U.S. 645 (1978). Under California law, any entity seeking to divert and use water must obtain a permit from the SWRCB. In turn, the SWRCB grants water rights permits and imposes conditions upon them. Cal. Water Code § 1350. Consistent with these requirements, Interior applied for and was granted permits to operate the TRD, which permits include fish and wildlife enhancement as a purpose of use.[2] Instream uses of water

---

[2] *In the Matter of Implementation of Water Quality Objectives for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary; A Petition to Change Points of Diversion of the Central Valley Project and the State Water Project in the Southern*

6

to preserve fish and wildlife are beneficial uses of water that must be considered when approving permit applications. Cal. Water Code § 1243.

In 2012, when Reclamation previously made a flow augmentation release similar to the one proposed for 2013, Reclamation sought to confirm that the augmentation flows would be consistent with its existing permits by submitting a temporary urgency petition to the SWRCB. *See* Doc. 54, Holm Decl. at ¶ 2. The SWRCB confirmed in a letter that Reclamation could release water for nonconsumptive cultural resource needs and to improve instream conditions without obtaining a change of place of use approval. *Id*. at Ex. 2. Although there is some language in the SWRCB's letter that suggests Reclamation might nevertheless require some approval from the SWRCB to implement the 2013 flow augmentation, the Court declines to resolve this merits argument as this time, as the TRO can be supported on alternative grounds.

3. **NEPA.**

Federal Defendants appear to concede that the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*., applies to the flow augmentation plan.[3] In early August 2013, the Bureau of Reclamation issued an Environmental Assessment ("EA") purporting to evaluate the impacts of the augmentation. Doc. 25-3. The EA gives little attention to the potential environmental impacts of reduced

---

*Delta, and A Petition to Change Places of Use and Purposes of Use of the Central Valley Project*, Cal. State Water Res. Control Bd., D-1641 (revised), (Mar. 15, 2000), available at http://www.waterboards.ca.gov/waterrights/board_decisions/adopted_orders/decisions/d1600_d1649/wrd1641_1999dec29.pdf.

[3] The Hoopa Valley Tribe also appears to acknowledge NEPA at least applies to the flow augmentation program, instead asserting, like Federal Defendants, that Reclamation satisfied NEPA by issuing the EA. Doc. 50 at 19. PCFFA, however, asserts that NEPA does not even apply to the planned 2013 flow augmentation, arguing that because the planned flows fall within historic parameters, the flows do not constitute a "major federal action," citing *Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 234-35 (9th Cir. 1990). PCFFA misapplies *Upper Snake River*, which held that a water project constructed before the passage of NEPA did not become subject to NEPA unless a change was made to its operations that deviated from how the project was operated historically. Here, PCFFA points to language in the EA that suggests the planned flow augmentation releases would not "exceed the historic range of flows in the Trinity River." Doc 25-3 at 1. This is not analogous to the situation in *Upper Snake River*. Here, a return to "historic" flows on the Trinity River is a marked departure from how the Trinity River Division has been operated since its construction. As the increased minimum flows called for in the TRROD required NEPA review, so too would further increases to minimum flows imposed by any flow augmentation program.
   PCFFA also asserts that Plaintiffs do not have standing to pursue a NEPA claim because they do not allege injury within the zone of interest protected by NEPA, the goal of which is to protect the environment, not private economic interests. PCFFA questions whether Plaintiffs have demonstrated an interest in protecting some of the species that live in the Klamath Basin and that Plaintiffs claim may be harmed by the flow augmentation, but PCFFA ignores that Plaintiffs have a demonstrated interest in the environmental impacts that might result from reduced water deliveries to their service area. *See, e.g.,* Doc. 20 (William Bordeau discussing impacts of groundwater overdraft).

water supplies to water users in the Sacramento San Joaquin Basin, declaring instead that it is "not possible to meaningfully evaluate how a potential slightly lower Trinity River storage in 2014 may exacerbate system-wide supply conditions in the future." This does not appear to be in conformity with previous rulings in related cases. *See Consol. Salmonid Cases*, 688 F. Supp. 2d 1013, 1033-34 (E.D. Cal. 2010) (requiring Reclamation to evaluate the environmental impacts of reduced water deliveries).

**B.     Irreparable Harm/Balance of the Equities.**

In a worst-case scenario, the flow augmentation plan would utilize 109 thousand acre-feet ("TAF") of water. Doc. 53, Reck Decl., ¶ 18. Current and predicted conditions suggest the total use will likely be less than 62 TAF. *Id*. Yet, even at these levels, there is a non-speculative potential for irreparable harm to Plaintiffs. The chance of harm in 2013 is low. The initial allocation for the 2012/13 water year was finalized before the flow augmentation plan was adopted. Doc. 52, Milligan Decl., at ¶ 8. Although it is hypothetically possible that the allocation could be increased, re-diverting water stored in the Trinity Reservoir to south-of-Delta users is limited in the late summer and/or early fall because of the limited capacity of the tunnel used to make such transfers. *Id*. at ¶ 9.

However, if conditions next year are below normal, the "cumulative reduced volume in Trinity Reservoir would likely lead to reduced releases to the Sacramento River next summer that could have supported higher CVP allocation to some part of the CVP service area" in the 2013/14 water year. *Id*. at ¶ 10. Although this harm depends on next year's weather conditions, this makes the harm "contingent" not "speculative." To hold otherwise would make it impossible for a water user to ever obtain injunctive relief based upon a storage deficit.

The record establishes that the water supply situation in Plaintiffs' service areas is already dire, with resulting economic and environmental harms. *See* Docs. 17- 22. Although it is true that current conditions on the ground cannot be traced to the 2013 flow augmentation plan, it is equally true that every additional acre foot of surface water Plaintiffs are able to obtain from the CVP will help alleviate these harms. *See* Doc. 20 at ¶ 9 ("even a small increase in surface water" would help offset the harms caused by increased groundwater use).

On the other side of the balance, the flow augmentation releases are designed to prevent a potentially serious fish die off impacting salmon populations entering the Klamath River estuary, Doc. 25-3 (EA) at 1, an event that could have severe impacts on both commercial and tribal fishing interests, *see* Docs. 46 (Declaration of Michael Orcutt) & 48-1 (Declaration of David Bitts).

However, Plaintiffs' expert raises serious questions about whether these augmentation flows are truly necessary to prevent fish kills like that experienced in 2002. *See* Doc. 29, Hanson Decl. at 22 (indicating that a major study of the lower Klamath showed that neither run size nor flow during 2002 was out of the range of conditions over the previous 24 years when no fish die off was observed). Fisheries biologists employed by Federal Defendants and Defendant Intervenors appear to be of one mind that the fish flows are necessary, but the record does not sufficiently explain the bases for any such conclusions.

C.    **Public Interest.**

Both sides of this dispute represent significant public interests. Federal Defendants and Defendant Intervenors correctly point out that the federal government has invested large sums of money into the restoration of the fisheries in question. Yet, it is equally true that the government has and continues to invest in the long-term viability of agriculture in the Central Valley. Neither side holds veto power over the other.

## IV. CONCLUSION AND ORDER

The Court finds that Plaintiffs have demonstrated a likelihood of success on the merits and the probability of irreparable harm that is not clearly outweighed by the equities on the other side. Accordingly, the TRO currently in force is extended as follows:

SALLY JEWELL, as Secretary of the U.S. Department of the Interior; U.S. DEPARTMENT OF THE INTERIOR; U.S. BUREAU OF RECLAMATION; MICHAEL L. CONNOR, as Commissioner, Bureau of Reclamation, U.S. Department of the Interior; and DAVID MURRILLO, as Regional Director, Mid-Pacific Region, Bureau of Reclamation, U.S. Department of the Interior are RESTRAINED AND ENJOINED from making releases from Lewiston Dam to the Trinity River in

excess of 450 cubic feet per second ("cfs")[4] for fishery purposes through and including August 23, 2013.[5] Should conditions on the ground change so as to warrant modification to or vacation of this Modified TRO, Federal Defendants are instructed to immediately notify the Court. This is not an invitation for more argument, but rather only an invitation to tell the Court if the facts change.

Federal Defendants are further ordered to show cause on August 21, 2013, at 8:30 a.m., why this Modified TRO should not be converted to a preliminary injunction. The Court is particularly interested to hear from witnesses who can explain the scientific basis for the flow augmentation. The Court will also welcome oral argument on the legal issues.

This Order is issued on the 14th of August, 2013, at 4:00 p.m.

**SO ORDERED**

                                            **/s/ Lawrence J. O'Neill**
                                            **United States District Judge**

---

[4] Pursuant to the TRROD, releases from Lewiston Dam would remain at 450 cfs during the late summer, absent any augmentation. Doc. 25-3 at 5.

[5] Plaintiffs have already posted a $5,000 bond. This will remain in place as the bond securing this Modified TRO.