UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN LUIS & DELTA-MENDOTA WATER AUTHORITY and WESTLANDS WATER DISTRICT,<br><br>Plaintiffs,<br><br>v.<br><br>SALLY JEWELL, as Secretary of the U.S. Department of the Interior; U.S. DEPARTMENT OF THE INTERIOR; U.S. BUREAU OF RECLAMATION; MICHAEL L. CONNOR, as Commissioner, Bureau of Reclamation, U.S. Department of the Interior; and DAVID MURRILLO, as Regional Director, Mid-Pacific Region, Bureau of Reclamation, U.S. Department of the Interior,<br><br>Defendants,<br><br>THE HOOPA VALLEY TRIBE; THE YUROK TRIBE; PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS; and INSTITUTE FOR FISHERIES RESOURCES,<br><br>Defendant-Intervenors. | CASE NO. 1:13-CV-01232-LJO-GSA<br><br>**ORDER LIFTING TEMPORARY RESTRAINING ORDER AND DENYING MOTION FOR PRELIMINARY INJUNCTION** |

## I. INTRODUCTION

Plaintiffs have moved for a temporary restraining order and preliminary injunction, seeking to enjoin Federal Defendants from making certain "flow augmentation" releases of water from Trinity Reservoir beginning on August 13, 2013. Docs. 14 & 16. The stated purpose of the planned releases is to "reduce the likelihood, and potentially reduce the severity, of any Ich epizootic event that could lead to associated fish die off in 2013" in the lower Klamath River. Doc. 25-3 at 1.

On August 12, 2013, this Court issued a Temporary Restraining Order ("TRO") enjoining

1

Federal Defendants from implementing the flow augmentation until Friday, August 15, 2013, to provide additional time to evaluate the parties' positions. Doc. 57 (TRO). On August 14, 2013, having considered additional materials, the Court extended the TRO to afford an opportunity for an expedited hearing on Plaintiffs' motion for preliminary injunction. Doc. 62 (Modified TRO). Federal Defendants were ordered to show cause why the Modified TRO should not be converted to a preliminary injunction. *Id*. at 10. The Court expressed particular interest in hearing from witnesses who could explain the scientific basis for the flow augmentation. *Id*.

The Court heard evidence and argument during a two day hearing starting August 21, 2013. In addition to receiving the testimony of several expert witnesses, the parties stipulated that all previously submitted declarations may be considered as evidence. Doc. 78. at 6.

## II. STANDARD OF DECISION

In order to secure injunctive relief prior to a full adjudication on the merits, a plaintiff must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id*. at 22.

In assessing the likelihood of success on the merits in a case such as this, where all claims are governed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*,[1] the court applies the deferential arbitrary and capricious standard of review. *Nat'l Wildlife Fed'n v. NMFS,* 524 F.3d 917 (9th Cir. 2008). Under the APA, reviewing courts may reverse agency action only if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §

---

[1] The claims in this case arise under the Central Valley Project Improvement Act ("CVPIA") § 3406(b)(23), Pub. L. No. 102-575, 106 Stat. 4600; 43 U.S.C. § 383; and the National Environmental Policy Act, ("NEPA"), 42 U.S.C. § 4321 *et seq*. None of these statutes explicitly provides for a private right of action. Therefore, claims alleging that a federal agency acted contrary to these provisions must be brought under and are governed by the APA. *See Morongo Band of Mission Indians v. F.A.A.*, 161 F.3d 569, 573 (9th Cir. 1998) (NEPA claims governed by APA); *San Luis & Delta-Mendota Water Auth. v. United States*, 672 F.3d 676, 699 (9th Cir. 2012) (same as to CVPIA).

706(2)(A). Courts should defer to the agency on matters within the agency's expertise unless the agency completely failed to address a factor that was essential to making an informed decision. *Nat'l Wildlife Fed'n v. NMFS,* 422 F.3d 782, 798 (9th Cir. 2005). A court "may not substitute its judgment for that of the agency concerning the wisdom or prudence of [the agency's] action." *River Runners for Wilderness v. Martin,* 593 F.3d 1064, 1070 (9th Cir. 2010). As the Ninth Circuit continued in *River Runners:*

> In conducting an APA review, the court must determine whether the agency's decision is "founded on a rational connection between the facts found and the choices made ... and whether [the agency] has committed a clear error of judgment." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.,* 273 F.3d 1229, 1243 (9th Cir. 2001). "The [agency's] action ... need only be a reasonable, not the best or most reasonable, decision." *Nat'l Wildlife Fed'n v. Burford,* 871 F.2d 849, 855 (9th Cir.1989).

*Id.* at 1070.

Reviewing courts must be at their "most deferential" when an agency makes predictions, "within its area of special expertise, at the frontiers of science." *Baltimore Gas & Elec. Co. v. NRDC,* 462 U.S. 87, 103 (1983); *Lands Council v. McNair,* 537 F.3d 981, 993 (9th Cir. 2008) (*en banc*). As the Ninth Circuit held in *Lands Council,* courts may not " 'impose on the agency [their] own notion of which procedures are 'best' or most likely to further some vague, undefined public good.' " 537 F.3d at 993 (quoting *Churchill County v. Norton,* 276 F.3d 1060, 1072 (9th Cir. 2001) (alteration in original) (quoting *Vt. Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 549 (1978)). In particular, an agency's "scientific methodology is owed substantial deference." *See Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.,* 378 F.3d 1059, 1066 (9th Cir. 2004). The deferential nature of a Court's inquiry into the merits is not altered at the preliminary injunction stage. *Lands Council,* 537 F.3d at 987; *Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric.,* 415 F.3d 1078, 1093 (9th Cir. 2005) (finding that, in granting a preliminary injunction, "the district court committed legal error by failing to respect the agency's judgment and expertise").

"The deference accorded an agency's scientific or technical expertise is not unlimited." *Brower v. Evans,* 257 F.3d 1058, 1067 (9th Cir. 2001). Deference is not owed if "the agency has completely failed to address some factor consideration of which was essential to making an informed decision," *id.,* and

3

courts are not required to defer to an agency conclusion that runs counter to that of other agencies or other individuals with specialized expertise in a particular technical area, *see, e.g., Am. Tunaboat Ass'n v. Baldrige,* 738 F.2d 1013, 1016–17 (9th Cir. 1984) (agency decision under the Marine Mammal Protection Act was not supported by substantial evidence because agency ignored data that was product of "many years' effort by trained research personnel").

Although a court's analysis of likelihood of success in the context of an injunctive relief request is governed by the deferential APA's arbitrary and capricious standard, *see Lands Council,* 537 F.3d at 987; *Ranchers Cattlemen,* 415 F.3d at 1093, a court does not always owe deference to federal agencies' positions concerning irreparable harm, balance of hardships, or public interest. In *Sierra Forest Legacy v. Sherman,* 646 F.3d 1161, 1186 (9th Cir. 2011), decided in the context of a motion for a post-judgment permanent injunction, the Ninth Circuit held that a district court "abused its discretion by deferring to agency views concerning the equitable prerequisites of an injunction." The Ninth Circuit reasoned that "[e]cology is not a field within the unique expertise of the federal government," and remanded for analysis "without deference" to the agency's experts "simply because of their relationships with the agency." *Id.* If government experts "were always entitled to deference concerning the equities of an injunction, substantive relief against federal government policies would be nearly unattainable." *Id.* It is not clear whether this standard applies to pre-judgment motions for temporary and/or preliminary injunctive relief. Even if it does, there are no real disputes among the scientific experts in this case.

### III. DISCUSSION

A.  **Factual Background.**

The Trinity and Klamath River Basins drain a large area of Northern California and Southern Oregon. The Trinity River Division ("TRD") is a component of the Central Valley Project ("CVP"), which is, in turn, one of the largest and most complex water distribution systems in the world, consisting of "an extensive system of dams, tunnels, canals, and reservoirs that stores and regulates water for California's Central Valley." *Westlands Water Dist. v. U.S. Dept. of Interior.* 376 F.3d 853, 861 (9th Cir. 2004). The TRD impounds the mainstem of the Trinity River initially at Trinity Dam, behind which

water accumulates to form the approximately 2,448,000 acre-foot[2] ("AF") Trinity Reservoir." *Id*. A second reservoir and dam, Lewiston, which sits slightly downstream of Trinity Reservoir, regulates water releases to the Trinity River. *Id*. Water can also be diverted from Trinity Reservoir into the Sacramento River Basin through a tunnel at Clear Creek. *Id*. The Klamath River is also blocked by several dams making up the Klamath Project, the most downstream of which is Iron Gate Dam, located in California. *Pac. Coast Fed'n of Fishermen's Associations v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1085 (9th Cir. 2005) ("*PCFFA*").

The mainstem of the Trinity River meets the South Fork of the Trinity just south of Willow Creek, California. The Trinity River then flows through the Hoopa Valley Indian Reservation, which also encompasses a small stretch of the Klamath River as the Klamath flows west toward its confluence with the Trinity. The confluence is just north of the Hoopa Valley Reservation and within the boundary of the adjoining Yurok Reservation.[3] The stretch of the Klamath below the confluence has been referenced by the parties as the "lower Klamath." The Yurok Reservation surrounds the lower Klamath for one mile on either side of the lower Klamath, roughly from the ocean to the confluence with the Trinity, 20 miles upstream. *Blake v. Arnett,* 663 F.2d 906, 908 (9th Cir. 1981)

Construction and operation of the TRD "radically altered" the Trinity River environment, "destroying or degrading river habitats that supported once-abundant fish populations." *Westlands*, 376 F.3d at 862. Habitat for fish has also been degraded by Klamath Project water diversions. *See, e.g.*, *Kandra v. United States*, 145 F. Supp. 2d 1192, 1197 (D. Or. 2001).

**B.   Likelihood of Success on the Merits.**

Plaintiffs argue that Federal Defendants lack legal authority to make the planned flow augmentation releases and therefore that Plaintiffs are entitled to relief under the APA, which provides that a reviewing court shall "hold unlawful and set aside agency action ... found to be (A) arbitrary,

---

[2] An acre foot of water is the volume of water required to cover one acre of surface area to the depth of one foot, or approximately 43,560 cubic feet. *United States v. Westlands Water Dist*., 134 F. Supp. 2d 1111, 1139 n. 61 (E.D. Cal. 2001)
[3] The Court takes judicial notice of these undisputed facts, presented in a map during the hearing that was inadvertently not admitted into evidence.

5

capricious, an abuse of discretion, or otherwise not in accordance with law; ... (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2). Specifically, Plaintiffs argue that implementing the flow augmentation will:

(1) violate Federal Defendants' mandatory duty under Central Valley Project Improvement Act ("CVPIA") § 3406(b)(23), Pub. L. No. 102-575, 106 Stat. 4600, because the planned flows exceed those permitted in the Record of Decision for Trinity River Mainstem Fishery Restoration ("TRROD") called for in § 3406(b)(23);

(2) violate CVPIA § 3411(a) and 43 U.S.C. § 383 because Federal Defendants failed to obtain an amendment to the approved place of use of the water that will be released pursuant to the flow augmentation plan; and

(3) violate the National Environmental Policy Act, ("NEPA"), 42 U.S.C. § 4321 *et seq*., because Federal Defendants failed to engage in a sufficiently robust evaluation of the flow augmentation's environmental impacts.

### 1. <u>CVPIA § 3406(b)(23).</u>

CVPIA § 3406(b)(23) directs the Secretary of the Interior to maintain certain minimum instream flows in the Trinity River "to meet Federal trust responsibilities to protect the fishery resources of the Hoopa Valley Tribe, and to meet the fishery restoration goals of the Act of October 24, 1984, Pub. L. 98-541." From 1992-1996, section 3406(b)(23) set a default minimum instream flow at "not less than 340,000 acre-feet per year," with the further instruction that this default minimum flow could be increased based upon a flow evaluation study and with the concurrence of the Hoopa Valley Tribe. Following completion of the flow evaluation study, the Department of the Interior initiated an environmental review process to develop and assess alternatives to restore the Trinity River. *See* 59 Fed. Reg. 27,060-02 (June 17, 1992). As part of this process, the Secretary issued a draft environmental impact statement ("EIS") pursuant to NEPA. *See id*. Following public comment, the Secretary issued the TRROD in December 2000. Doc. 25-1.

6

Among other things, the TRROD sets forth the volume of water to be released to provide instream flows below Lewiston Dam on the Trinity River in various water year types. Doc. 25-1 (TRROD) at 12. It also clearly indicates that while "the schedule for releasing water on a daily basis … may be adjusted … the annual flow volumes … may not be changed." *Id*. This suggests that the flow volumes set forth in the TRROD are <u>maximums</u>, as well as minimums. This implication is further supported by the fact that the TRROD itself discusses numerous environmental impacts that could result from the use of the respective flow in the Trinity River, as opposed to transferring some of that flow (as was historically done) to the Sacramento/San Joaquin basin. *Id*. at 19-24. The more water dedicated to instream uses, the greater those impacts would be. Whether this language in the TRROD operates as a *per se* legal impediment to additional releases or merely a legal impediment to additional releases absent further environmental review is not entirely clear. The CVPIA contains no language directly incorporating the limits set forth in the TRROD into the CVPIA.

Even if the TRROD operates as an upper limit, the TRROD is limited in its geographic scope. Federal Defendants and Defendant Intervenors point to authorities that suggest Federal Defendants nevertheless have discretion to provide additional flows for fish and wildlife restoration <u>below</u> the confluence of the Trinity and Klamath Rivers. Federal Defendants maintain they possess discretion to implement the flow augmentation to benefit fish below the confluence on the lower Klamath, including fish whose lives originated upstream on the Klamath River.

For example, Section 2 of the 1955 Trinity River Division Central Valley Project Act, Pub. L. No. 84-386, 69 Stat. 719, provides general authorization to integrate the Trinity River Division with other features of the Central Valley Project, with the proviso that the Secretary "is authorized and directed to adopt appropriate measures to insure the preservation and propagation of fish and wildlife, including, but not limited to the maintenance of the flow of the Trinity River below the diversion point at not less than one hundred and fifty cubic feet per second ...." An interpretive opinion issued by the Solicitor of the Department of the Interior in 1979 concluded that this language required that the instream flow needs of the Trinity Basin must be met first prior to exporting water to the Central Valley.

Memorandum from the Solicitor to Assistant Secretary –Land and Water Resources, *Proposed Contract with Grasslands Water District* (Dec. 7, 1979), Doc. 51-3 (Krulitz Opinion). It is not clear whether the instruction to maintain a certain minimum flow in the "Trinity River below the diversion point" was meant to be geographically limited to the Trinity River above the confluence, although this does appear to be the intent of the plain language.

In addition, the 1955 Act provides that "not less than 50,000 acre-feet shall be released annually from the Trinity Reservoir and made available to Humboldt County and downstream water users." Pub. L. No. 84-386, 69 Stat. 719, § 2. The record is not well developed on this issue. Members of Congress from the Humboldt area wrote to the Secretary of the Interior requesting that the 50,000 AF allocation be put to use in supporting the flow augmentation. Doc. 48-6. Yet, Federal Defendants have taken no position on this possible source of authority.

In 1984, Congress passed the Trinity River Basin Fish and Wildlife Management Act, Pub. L. No. 98-541, 98 Stat. 2721, which directed the Secretary to implement a management program "for the Trinity River Basin designed to restore the fish and wildlife populations ... to the levels approximating those which existed immediately before the start of construction [of the Trinity River Division] and to maintain such levels." *Id*. at § 2. This Act calls for rehabilitation of fish habitat in both the "Trinity River between Lewiston Dam and Weitchpec" as well as "in tributaries of such river below Lewiston Dam and in the south fork of such river." *Id*.; *see also Westlands Water Dist. v. U.S. Dept. of Interior*, 376 F.3d 853, 866 (9th Cir. 2004).

As discussed above, the 1992 CVPIA set a default minimum flow requirement for the Trinity River, while permitting increased instream flows after consultation with the Hoopa Valley Tribe. CVPIA § 3406(b)(23). In addition, the CVPIA listed among its purposes "to protect, restore, and enhance fish, wildlife, and associated habitats in the Central Valley and Trinity River Basins." CVPIA § 3402(a).

In 1996, Congress reauthorized and amended the 1984 Trinity River Basin Fish and Wildlife Management Act. Pub. L. 104-143. Of interest here is the fact that the scope of the act's rehabilitation

mandate was expanded to include the Klamath River downstream of the confluence with the Trinity River. *See id.* at § 3. Nothing in the 2000 TRROD directly addresses restoration activities in the lower Klamath. Does the TRROD limit Reclamation's authority to augment flows in the lower Klamath? The Court is unable to provide a definitive answer to this question on the existing record.

Defendants do point out, correctly, that Federal Defendants have a trust responsibility to the various Indian tribes that rely upon the fish populations in question. Both the Hoopa Valley and Yurok Tribes have federally protected fishing rights in the Trinity and Klamath Rivers. *See generally Blake v. Arnett*, 663 F.2d 906 (9th Cir. 1981). The Supreme Court has long recognized "the distinctive obligation of trust" that binds the government in its dealings with Indian people. *Seminole Nation v. United States,* 316 U.S. 286 (1942). In carrying out its treaty obligations, the government

> is something more than a mere contracting party. Under a humane and self imposed policy which has found expression in many acts of Congress and numerous decisions of this Court, it has charged itself with moral obligations of the highest responsibility and trust. Its conduct, as disclosed in the acts of those who represent it in dealings with the Indians, should therefore be judged by the most exacting fiduciary standards.

*Id.* at 296-97. The Ninth Circuit has "read the [trust] obligation to extend to any federal government action." *Hoopa Valley Indian Tribe v. Ryan*, 415 F.3d 986, 992-93 (9th Cir. 2005). As a general rule, a federal agency is permitted to operate a water project to satisfy Tribal rights. *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1213-14 (9th Cir. 1999).

In 1981, the Secretary of the Interior issued a decision indicating that the Secretary's trust responsibilities to the Hoopa and Yurok Indian tribes, combined with other federal laws, required the restoration of the TrinityRriver's salmon and steelhead populations to "pre-project levels." Secretarial Issue Document, Trinity River Fishery Mitigation (Jan. 14, 1981), Doc. 51-4. In 1993, Solicitor Leshy issued a published opinion, which addressed the Tribes' rights to a share of the Klamath Basin's anadromous fishery resources. United States Department of the Interior, Office of the Solicitor, M-36979, Fishing Rights of the Yurok and Hoopa Valley Tribes (Oct. 3, 1993), 1993 WL 13564018. The Opinion concluded:

> The Secretary of the Interior has acted in the past to increase flows in the Trinity River, in

9

> part to improve the fishery for the benefit of the Indians. This was a recognition that protection of the fishery itself is necessary to make the tribal fishing right meaningful. In order for both the purpose of the reservations and the objectives of the Magnuson Act to be fulfilled, the fishery resource here must be rebuilt to sustain a viable fishery for all user groups, consistent with sound conservation practices....
>
> ***
>
> As a general matter, all parties that manage the fishery, or whose actions affect the fishery, have a responsibility to act in accordance with the fishing rights of the Tribes. This may go beyond safeguarding their right to an appropriate share of the harvest on their reservations, ... to include a viable and adequate fishery from which to fulfill the Tribes' rights, whether those rights are fulfilled by a 50% share or by a lesser amount, if a lesser amount will satisfy fully the moderate living standard to which the Tribes are entitled.

*Id*. at *16.

The CVPIA and TRROD appear to be, at least in part, aimed at addressing these trust responsibilities. The Leshy opinion acknowledges as much, citing the CVPIA § 3406(b)(23) instream flow directive. *Id*. at *15. Yet the 1996 amendments to the 1984 Act specifically provided that "[n]othing in this Act shall be construed as establishing or affecting any past, present, or future rights of any Indian or Indian tribe or any other individual or entity." Pub. L. No. 104-143, § 5.

Moreover, the Yurok Reservation and a small piece of the Hoopa Reservation are located on the Klamath River. (As mentioned above, the Yurok reservation extends along the banks of the lower Klamath from the confluence to the Klamath estuary.) Given all of this, should Federal Defendants' trust responsibilities be limited to the volume of water allocated in the TRROD? Neither the TRROD nor the CVPIA directly addresses this issue. In general, absent an explicit congressional command, a court should be reluctant to abrogate tribal rights. *Menominee Tribes v. United States*, 391 U.S. 404, 412-13 (discussing treaty rights).

There are colorable arguments on both sides regarding Federal Defendants' authority to make these releases. Likelihood of success is a prerequisite to the issuance of injunctive relief; lack thereof is not a prerequisite to refusing said relief. Accordingly, the Court declines to issue definitive rulings on any of these complex, important issues on the present record.

### 2. Change of Place of Use.

Plaintiffs next argue that the flow augmentation would violate the water rights permit Reclamation holds for the Trinity River Division, asserting Reclamation was required to obtain permission to change the place of use of the water from the California State Water Resources Control Board ("SWRCB"). Federal law requires Reclamation to follow state law as to the control, appropriation, use, or distribution of water used in irrigation and to obtain state-issued water rights permits for its projects. 43 U.S.C. § 383; *California v. United States*, 438 U.S. 645 (1978). Under California law, any entity seeking to divert and use water must obtain a permit from the SWRCB. In turn, the SWRCB grants water rights permits and imposes conditions upon them. Cal. Water Code § 1350. Consistent with these requirements, Interior applied for and was granted permits to operate the TRD, which permits include fish and wildlife enhancement as a purpose of use.[4] Instream uses of water to preserve fish and wildlife are beneficial uses of water that must be considered when approving permit applications. Cal. Water Code § 1243.

In 2012, when Reclamation previously made a flow augmentation release similar to the one proposed for 2013, Reclamation sought to confirm that the augmentation flows would be consistent with its existing permits by submitting a temporary urgency petition to the SWRCB. *See* Doc. 54, Holm Decl. at ¶ 2. The SWRCB confirmed in a letter that Reclamation could release water for nonconsumptive cultural resource needs and to improve instream conditions without obtaining a change of place of use approval. *Id*. at Ex. 2. Although there is some language in the SWRCB's letter that suggests Reclamation might nevertheless require some approval from the SWRCB to implement the 2013 flow augmentation, the Court declines to resolve this merits argument as this time.

---

[4] In the Matter of Implementation of Water Quality Objectives for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary; A Petition to Change Poitns of Diversion of the Central Valley Proejct and the State Water Project in the Southern Delta, and A Petition to Change Places of Use and Purposes of Use of the Central Valley Project, Cal. State Water Res. Control Bd., D-1641 (revised), (Mar. 15, 2000), available at http://www.waterboards.ca.gov/waterrights/board_decisions/adopted_orders/decisions/d1600_d1649/wrd1641_1999dec29.pdf.

11

### 3. **NEPA**

Federal Defendants appear to concede that the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, applies to the flow augmentation plan.[5] In early August 2013, the Bureau of Reclamation issued an Environmental Assessment ("EA") purporting to evaluate the impacts of the augmentation. Doc. 25-3. The EA gives little attention to the potential environmental impacts of reduced water supplies to water users in the Sacramento San Joaquin Basin, declaring instead that it is "not possible to meaningfully evaluate how a potential slightly lower Trinity River storage in 2014 may exacerbate system-wide supply conditions in the future." This is at least arguably not in conformity with previous rulings in related cases. *See Consol. Salmonid Cases*, 688 F. Supp. 2d 1013, 1033-34 (E.D. Cal. 2010) (requiring Reclamation to evaluate the environmental impacts of reduced water deliveries).

Nevertheless, even in the presence of likely success on the merits of a NEPA claim, it is not appropriate to issue injunctive relief where doing so would cause more environmental harm than it would prevent. *Save Our Ecosystems v. Clark*, 747 F.2d 1240, 1250 (9th Cir. 1984); *Am. Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 966 (9th Cir. 1983) (holding public interest does not favor granting an injunction where "government action allegedly in violation of NEPA might actually jeopardize natural resources"); *Alpine Lakes Prot. Soc'y v. Schlapfer*, 518 F.2d 1089, 1090 (9th Cir. 1975) (denying injunctive relief in NEPA case where more harm could occur to forest from disease if injunction was granted); see also *Consol. Delta Smelt Cases*, 717 F. Supp. 2d 1021, 1058 (E.D. Cal. 2010) (reviewing relevant caselaw).

---

[5] The Hoopa Valley Tribe also appears to acknowledge NEPA at least applies to the flow augmentation program, instead asserting, like Federal Defendants, that Reclamation satisfied NEPA by issuing the EA. Doc. 50 at 19. PCFFA, however, asserts that NEPA does not even apply to the planned 2013 flow augmentation, arguing that because the planned flows fall within historic parameters, the flows do not constitute a "major federal action," citing *Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 234-35 (9th Cir. 1990).
  PCFFA also asserts that Plaintiffs do not have standing to pursue a NEPA claim because they do not allege injury within the zone of interest protected by NEPA, which is to protect the environment, not private economic interests. PCFFA questions whether Plaintiffs have demonstrated an interest in protecting some of the species that live in the Klamath Basin and that Plaintiffs' claim may be harmed by the flow augmentation, but PCFFA ignores that Plaintiffs have a demonstrated interest in the environmental impacts that might result from reduced water deliveries to their service area. *See, e.g.,* Doc. 20 (William Bordeau discussing impacts of groundwater overdraft).

12

**C.    Irreparable Harm/Balance of the Equities.**

**1.    The Proposed Action.**

According to the EA, if the augmentation action is permitted to proceed, Reclamation would operate Trinity and Lewiston Reservoirs to target a minimum flow of 2,800 cfs in the lower Klamath River as measured at United States Geological Survey ("USGS") station "KNK." Doc. 25-3 at 5. This operation would be subject to the following four "environmental and biological conditions, which are to be informed by active monitoring programs." *Id*.

> 1) Flow augmentation to meet the 2,800 cfs target at KNK would commence August 15th but would not interfere with timing or magnitude of the scheduled Hoopa Valley Tribe's Ceremony flows scheduled to occur in late August [].
>
> 2) Flow augmentation to meet the 2,800 cfs target at KNK would continue through September 21, and possibly through September 30 if average daily water temperatures are projected to be above 23 C at KNK, or the presence of observed fish behavior of concern (see Strange 2010). Daily evaluations would be made to determine whether augmentation flows would continue and for how long between September 21 and 30.
>
> 3) Monitoring would also be used to gain knowledge regarding the ecological consequences of the actions while also informing management whether additional actions may be required to thwart a fish die-off in 2013. For example, the Yurok Tribe will sample adult Chinook salmon and thoroughly examine them for signs of Ich infection. In the very unlikely and emergency situation that a threshold number of examined adults are infected with Ich, as confirmed by the Service's California-Nevada Fish Health Center, an immediate emergency flow release from Lewiston Reservoir would be initiated to further disrupt the life cycle of the pathogen in an attempt to prevent a catastrophic disease outbreak. Specifically, Lewiston Reservoir would be operated to double the current flow on the lower Klamath River at the KNK gage for a 7-day period (up to a maximum flow of 5,600 cfs). Up to approximately 39 TAF would be needed to implement the emergency response. This is designed to increase the water turnover rate in areas where adult fish are holding, more effectively flush the infectious life form of Ich downstream into the estuary where they cannot survive, and make it more difficult for additional fish to be infected.
>
> 4) Ramping rates from Lewiston Dam would follow contemporary approved rates of change to minimize public and other environmental concerns.

*Id*. at 5-6.

An August 2013 memorandum from advising agency scientists provides some additional detail recommending Reclamation:

> - Initiate preventative flow augmentation in the lower Klamath River (RKM 13) to a minimum of 2,800 cfs when the cumulative harvest of Chinook salmon in the Yurok Tribal fishery in the Estuary area meets or exceeds a cumulative total of 7,000 fish

(Appendix C). The accounting of harvest should commence starting July 4 and we recommend all Chinook salmon, regardless of race, count toward the cumulative total.

- Fall flow augmentation should be initiated by August 22 if the fish metric is not triggered.

- Fall flow augmentation should continue until September 21 unless mean daily water temperature at rkm 13 is projected to be >23°C, in which case flow augmentation to maintain a minimum of 2,800 cfs should continue until daily water temperature at rkm 13 is projected to be <23°C or until the end of September when seasonal air temperatures typically cool and contribute to water temperatures suitable for upstream migration [].

- Implement real-time flow-temperature management using the RBM1O and SN Temp water temperature models developed for the Klamath and Trinity rivers and NOSA Weather Service weather projections to manage flows in assessing the 23°C water temperature migration threshold emergency flow release.

- Implement fish pathology monitoring to determine the need for a fish pathology/mortality emergency release, and

- Monitoring should occur during the fall-run Chinook salmon migration period in the lower Klamath River to inform the need and timing of preventative and emergency flow releases based on real-time environmental conditions (Figure 3; Appendix D).

US Ex. 12 at 5.

This document also explains that additional releases would be implemented if certain thresholds are exceeded. First, if mean water temperature at rkm 13 is projected to be greater than 23 degrees Celsius ("C") for three consecutive days, this would trigger releases designed to increase flow in the lower Klamath at rkm 13 to 3,200 cfs, which would continue until mean daily water temperature drops back below 23 degrees C or until the end of September. *Id*. at 9.

A "Fish Pathology/Mortality Criterion" would be used to trigger an emergency fall flow release. Id. at 9-10. This criterion has two prongs. First, the emergency flows would be triggered when a "severe Ich infection" is observed in 5% or greater of the weekly adult fish health monitoring samples collected by resource agencies, with Ich infections confirmed by pathology studies. *Id*. at 10. Alternatively, emergency flows would be implemented if more than 50 adult salmonids, regardless of cause, are observed dead in a 20-km reach within a 24 hour time period. *Id*. If either criteria is met, this would trigger diagnostic studies to determine the severity of any Ich infection or the cause of death of any large mortality event, with a "severe," triggering infection defined as "a minimum of 5% of the sampled fish

14

having 30 or more parasites on one gill arch." *Id*. This would trigger augmentation of flows on the lower Klamath designed to double the preexisting flow for seven consecutive days. *Id*.

### 2. **Impact to Water Supply.**

In their initial moving papers, based in part upon Federal Defendants' own estimates, Plaintiffs asserted that in a worst-case scenario, the flow augmentation plan would utilize 109 thousand acre-feet ("TAF") of water. Reck First Decl., Doc. 53, ¶ 18. At the time of the filing of Federal Defendant's opposition (before the imposition of the initial TRO), conditions suggested the total use would likely be less than 62 TAF. *Id*. In light of the operation of the initial and modified TROs as well as recent hydrologic conditions, Federal Defendants further modified their projections, and now estimate that only 20,000 AF of water will be utilized. 8/21/13 Rough Tr. ("RT") at 37:22 (Reck); *see also* Declaration of Dr. Joshua Strange, Doc. 86 at ¶ 2.

### 3. **Resulting Impacts to Plaintiffs**

Even at this lower estimate, there is a non-speculative potential for irreparable harm to Plaintiffs. The chance of harm in 2013 is low. The initial allocation for the 2012/13 water year was finalized before the flow augmentation plan was adopted. Doc. 52, Milligan Decl., ¶ 8. Although it is hypothetically possible that the allocation could be increased, re-diverting water stored in the Trinity Reservoir to south-of-Delta users is limited in the late summer and/or early fall because of the limited capacity of the tunnel used to make such transfers. *Id*. at ¶ 9.

If conditions next year are below normal, the "cumulative reduced volume in Trinity Reservoir would likely lead to reduced releases to the Sacramento River next summer that could have supported higher CVP allocation to some part of the CVP service area" in the 2013/14 water year. *Id*. at ¶ 10. Although this harm depends on next year's weather conditions, this makes the harm "contingent" not "speculative." To hold otherwise would make it impossible for a water user to ever obtain injunctive relief based upon a storage deficit. Yet, it also cannot be ignored that Plaintiffs hold contractual rights to CVP water that are junior to many other CVP contract holders and subject to diminishment for numerous other reasons, including satisfying needs of species listed under the Endangered Species Act

15

("ESA"). *See generally O'Neill v. United States*, 50 F.3d 677 (9th Cir. 1995).

The record establishes that the water supply situation in Plaintiffs' service areas is already dire, with resulting economic and environmental harms. *See* Docs. 17- 22. Although it is true that current conditions on the ground cannot be traced to the 2013 flow augmentation plan, it is equally true that every additional acre foot of surface water Plaintiffs is able to obtain from the CVP will help alleviate these harms. *See* Doc. 20 at ¶ 9 ("even a small increase in surface water" would help offset the harms caused by increased groundwater use). However, it is undisputed that if the current estimate of 20,000 AF were not permitted, that the Plaintiff's ultimate share would be less than that total.

### 4. **Potential Harm to the Environment if Augmentation is Not Permitted.**

On the other side of the balance, the flow augmentation releases are designed to prevent a potentially serious fish die off from impacting salmon populations entering the Klamath River estuary. Doc. 25-3 at 1. There is no dispute and the record clearly reflects that the 2002 fish kill had severe impacts on commercial fishing interests, tribal fishing rights, and the ecology, and that another fish kill would likely have similar impacts. *See, e.g.*, Docs. 46 (Declaration of Michael Orcutt) & 48-1 (Declaration of David Bitts).

All experts appear to be in agreement that there were certain "contributing factors" to the 2002 fish kill. 8/21/13 RT at 42-43. First, there were "remarkably low flows" during August and September of 2002. *Id*. at 42:4-5. Second, there were "crowded fish conditions," due both to the relatively large run size and the relatively large percentage of that run made up of Klamath sub-basin fish, which fish tend to linger for extended periods of time in the lower reaches of the Klamath before initiating further upstream migration. *Id*. at 42:5-11, 54:7-18. Finally, there were some migration delays and relatively high temperatures. *Id*. at 42: 8-11.

Dr. Joshua Strange, who among the testifying experts appears to have the most relevant background, education and experience relative to the key issues, emphasized the importance of the flow[6]

---

[6] Flow is a rate measurement of volume of water passing past a given point, 8/21/13 RT at 143:16-18, normally expressed in

component in light of the biology of the Ich parasite. Ich, a ciliated protozoan, *id*. at 45:6-7, has a very well understood life cycle, *id*. at 138:23-139:2. It has a free-swimming infectious stage, during which time it must find a host fish or die. *See id*. at 137:9-14. Ich cannot live for long in open water, and usually only has 72 hours to find a host. *See id*. at 139:21-23. Once it locates a host, it must attach itself and "burrow in" to the host, where it is able to feed on the fish's fluids and mature. *Id*. at 137:9-14. After reaching maturity, it exits the fish and drops into the river, where it divides and then bursts, releasing free-swimming offspring into the water. *Id*. at 137:15-20.

In its free-swimming stage, Ich is a weak swimmer, *id*. at 139:14, relying on tiny hairs to provide mobility, *id*. at 137:20. This poor swimming capability is what makes flow so important to disrupting the parasite's life cycle. If water velocities are higher, Ich will have more trouble successfully contacting a fish using its chemosensory abilities. *See generally id*. at 142-43. Higher flow also can interfere with the "delicate docking procedure" Ich must undertake to attach to its host fish. *Id*. at 143:5-9.

Fish density is also important to Ich transmission, because, in a nutshell, the more fish surface area available for contact, the greater chance Ich will find a place to land. *Id*. at 141:3-12. Temperature can also have some impact on Ich transmission rate, as Ich matures more quickly at warmer temperatures. *Id*. at 141:17-142:7.

Dr. Strange has examined Ich in the Klamath in detail relative to the factors identified after the 2002 fish kill. Flows in the lower Klamath rarely drop below 2500 cfs. *Id*. at 148:10-11. The average flow for that location from the last week of August to the third week of September is 3200 cfs. *Id*. at 148:18-19. There have only been two years in which flows dropped below 2500 cfs and the run size was relatively large. *Id*. at 149:7-14. One of those years was 2002, the year of the fish kill. The other was

---

cubic feet per second in these cases. This is related to water velocity, which is an expression of the speed of the water column at any given point in the river. Plaintiffs made much of the fact that the only study providing any quantitative analysis of the impact of flow on Ich concluded that Ich outbreaks would be prevented at a particular velocity, rather than a particular flow. *See generally* 8/21/13 RT at 174-82. However, all experts appear to agree that in a river environment, there may be a wide variety of velocities occurring in any given cross section of the river. While it would be advantageous to be able to calculate a specific velocity needed to flush Ich and translate that into the flow required to do so, the information that would provide the basis for such calculations appears to be nonexistent.

17

1988, which experienced no fish kill. *Id*. at 149:7-19. Dr. Strange opined that this pattern could be interpreted in one of two ways. Either there is a 50/50 chance of a fish kill under similar circumstances, or there may be a distinction between the two years. *Id*. at 149-151. He indicated that one possible distinction was the relatively high level of harvest in 1988, which might have minimized crowding that year. *Id*. at 155:10-16. In either case, he believes there is a "significant level of risk" of an Ich outbreak should similar conditions be permitted to prevail. *See id*. at 162:6-15.

He supported this opinion with examples of Ich outbreaks from other river systems, namely several outbreaks in British Columbia and another in Butte Creek, a tributary to the Sacramento River. Strange Decl., Doc. 86, ¶ 3.3. He further explained that Ich is believed to be always present in the background in the lower Klamath, residing in resident fish species. *Id*. at 146:14-17.

In his opinion, flows of 2,500 cfs are the absolute minimum required for a reasonable level of confidence that an Ich outbreak is unlikely to occur. Strange Decl. ¶ 4.1. In years with larger projected run sizes, he recommends maintaining a slightly higher base flow of 2,800 cfs. *Id*. at ¶ 4.2. Plaintiffs' expert Dr. Hanson did not disagree with this general approach from a biological perspective, although he pointed out that there is simply an absence of information that would permit a "finer level of resolution" to evaluate "incremental effects of …changes in management strategies." 8/22/13 RT.

Dr. Strange emphasized the importance of preventing an Ich outbreak before one occurs, given that it is very difficult to get ahead of the disease once it takes hold in a population.[7] 8/21/13 RT at 146-47.

---

[7] Dr. Strange also provided forthright testimony regarding the justification for the pathology-based emergency flow releases that would double the flow in the lower Klamath for seven days when signs of an Ich outbreak are detected. While he did provide support for the general approach (using water to flush Ich from the population to minimize an outbreak), he admitted that there was no direct scientific justification for doubling the flow (as opposed to increasing it by 50% or tripling the flow). The record suggest that it is highly unlikely that the emergency flow releases will be required this year, so the Court does not believe it is important to fully resolve the emergency flow issue at this time. That said, there appears to be no scientific basis for this part of the proposal. Should conditions change, Plaintiffs may seek appropriate relief.

**D.      Public Interest.**

Both sides of this dispute represent significant public interests. Federal Defendants and Defendant Intervenors correctly point out that the federal government has invested large sums of money into the restoration of the fisheries in question. Yet, it is equally true that the government has and continues to invest in the long-term viability of agriculture in the Central Valley. Neither side holds veto power over the other. Nevertheless, on balance, considering the significantly lower volume of water now projected to be involved and the potential and enormous risk to the fishery of doing nothing, the Court finds it in the public interest to permit the augmentation to proceed.[8]

## IV. CONCLUSION AND ORDER

In conclusion, all parties have prevailed in a significant, responsible way. All is being done that can reasonably occur to prevent a major fish kill. At the same time, due to environmental conditions and the delay of one week (with no adverse fiscal or biological consequences), the amount of water required has fallen by two-thirds.

For the reasons set forth above, the TRO is lifted. Plaintiffs' request to convert the TRO into a preliminary injunction is DENIED.

IT IS SO ORDERED.

Dated:   **August 22, 2013**                    /s/ Lawrence J. O'Neill
                                                              UNITED STATES DISTRICT JUDGE

---

[8] Although many inaccurately believe this is a "farmer versus fish" issue, it is not. The complexities involve farmer fiscal issues, commercial fishermen issues, government contract matters, Indian Tribe survival concerns, and ecological factors.