1
2
3
4

**UNITED STATES DISTRICT COURT**

5

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

6
7

| | |
|---|---|
| SAN LUIS & DELTA-MENDOTA WATER AUTHORITY and WESTLANDS WATER DISTRICT, | CASE NO.  1:13-CV-01232-LJO-GSA |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 112 & 120)** |
| v. | |
| SALLY JEWELL, as Secretary of the U.S. Department of the Interior; U.S. DEPARTMENT OF THE INTERIOR; U.S. BUREAU OF RECLAMATION; MICHAEL L. CONNOR, as Commissioner, Bureau of Reclamation, U.S. Department of the Interior; and DAVID MURRILLO, as Regional Director, Mid-Pacific Region, Bureau of Reclamation, U.S. Department of the Interior, | |
| Defendants, | |
| THE HOOPA VALLEY TRIBE; THE YUROK TRIBE; PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS; and INSTITUTE FOR FISHERIES RESOURCES, | |
| Defendant-Intervenors. | |

## I. INTRODUCTION

This case concerns the U.S. Bureau of Reclamation's ("Reclamation" or "the Bureau") decision

to make certain "Flow Augmentation" releases ("FARs") of water beginning on August 13, 2013 from

Lewiston Dam, a feature of the Trinity River Division ("TRD") of the Central Valley Project ("CVP").

The stated purpose of the releases was to "reduce the likelihood, and potentially reduce the severity, of

1

any Ich epizootic event that could lead to associated fish die off in 2013" in the lower Klamath River. Administrative Record ("AR") at 00016-17. Plaintiffs, the San Luis & Delta Mendota Water Authority ("Authority") and Westlands Water District ("Westlands"), allege that by approving and implementing the 2013 FARs, Reclamation and its parent agency, the U.S. Department of the Interior ("Interior")[1] (collectively, "Federal Defendants"), violated various provisions of the Central Valley Project Improvement Act ("CVPIA"), Pub. L. No. 102-575, 106 Stat. 4700 (1992), and the Reclamation Act of 1902, 43 U.S.C. § 383. Doc. 95, First Amended Complaint ("FAC") at ¶¶ 77-91. In addition, Plaintiffs allege Federal Defendants acted unlawfully by approving and implementing the 2013 FARs without first preparing an Environmental Impact Statement ("EIS") pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, or engaging in consultation pursuant to the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.* FAC ¶¶ 92-104.

Plaintiffs filed suit in this Court on August 7, 2013, Doc. 1, and on August 9, 2013 filed a motion for temporary restraining order and preliminary injunction. Doc. 14. The parties stipulated to and the Court approved the intervention of the Hoopa Valley Tribe ("the Hoopa"), the Yurok Tribe ("the Yurok"), and the Pacific Coast Federation of Fishermen's Associations and Institute for Fisheries Resources as defendants. Docs. 38 & 70.

On August 13, 2013, the Court issued a temporary restraining order, restraining and enjoining Federal Defendants from making releases from Lewiston Dam to the Trinity River in excess of 450 cubic feet per second ("cfs") for fishery purposes through and including August 16, 2013. Doc. 57. Following a preliminary injunction hearing on August 21-22, 2013, the Court lifted the temporary restraining order and denied the associated motion for preliminary injunction. Doc. 91.[2]

---

[1] The First Amended Complaint also names as Defendants in their official capacities: Sally Jewell, the Secretary of the U.S. Department of the Interior; Michael L. Connor, Commissioner of the Bureau; and David Murrillo, Regional Director of the Bureau's Mid-Pacific Region. Doc. 95.

[2] This Court is not bound in any way by the reasoning or conclusions set forth in its prior rulings on the motions for injunctive relief. *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1090 (9th Cir. 2013) ("[D]ecisions at the preliminary injunction phase do not constitute the law of the case. This is true for the reason that a preliminary injunction decision is just that: preliminary.... [and] must often be made hastily and on less than a full record.") (internal citations and quotations omitted).

2

The FAC, filed October 4, 2013, alleges Federal Defendants violated: (1) CVPIA § 3406(b)(23) because, including the 2013 FARs, the total releases for fisheries purposes in 2013 exceeded the volume limit set in the Trinity River Record of Decision ("TRROD"), which adopted a plan for restoring the Trinity River mainstem fisheries pursuant to CVPIA § 3406(b)(23); (2) CVPIA § 3411(A) and 43 U.S.C § 383 because the 2013 FARs are a use of water outside the state permitted place of use; (3) NEPA by failing to prepare an EIS in connection with the 2013 FARs; and (4) the ESA by failing to engage in formal consultation prior to implementing the FARs. Doc. 95.

Federal Defendants filed the AR on December 20, 2013, Doc. 109, and supplemented the record on January 29, 2014. Doc. 110.

Before the Court for decision are cross motions for summary judgment on all of the claims asserted in the FAC. Docs. 112 & 120. The Court has thoroughly reviewed more than 250 pages of briefs, including eight pages of an amicus brief submitted by the California Department of Fish and Game ("CDFG"), Docs. 122 & 124, along with thousands of pages of associated exhibits, attachments, and declarations.[3]

While the cross motions were still pending, Federal Defendants authorized yet another set of flow augmentation releases, which began on August 25, 2014 ("2014 FARs"). *See* Doc. 151. Plaintiffs filed a motion for a temporary restraining order and/or preliminary injunction against the 2014 FARs. Docs. 142-43. The Court, while indicating that Plaintiffs were likely to succeed on at least one claim, denied the motions for injunctive relief based upon an analysis of the balance of the harms. *See* Doc. 175.

## II. STANDARD OF DECISION

All of the claims in this case arise under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, pursuant to which "[a] person suffering legal wrong because of agency action, or adversely

---

[3] In accordance with the Court's request, Defendant Intervenors' papers are narrower in focus than Federal Defendants' more comprehensive submissions. Unless Defendant Intervenors offer truly unique arguments, this order focuses on the arguments of Federal Defendants. The Court acknowledges, however, that Defendant Intervenors join/adopt Federal Defendants' motions/arguments.

3

affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." *Id.* § 702.[4] Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be":

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> ***
>
>  (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [and/or]
>
> (D) without observance of procedure required by law[.]

*Id.* § 706(A).

A reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated in part on other grounds as recognized in Califano v. Sanders*, 430 U.S. 99, 105 (1977). Although a court's inquiry must be thorough, the standard of review is highly deferential; the agency's decision is "entitled to a presumption of regularity," and a court may not substitute our judgment for that of the agency. *Id.* at 415-16.

Summary judgment is appropriate when the pleadings and the record demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court conducting APA judicial review may not resolve factual questions, but instead determines "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)). "[I]n a case involving review of a final agency action under the [APA] ... the standard set forth in Rule 56[(a)] does not apply because of the limited role of a court in reviewing the administrative record." *Id.* at 89. In this context, summary

---

[4] The CVPIA does not provide for a private right of action. Therefore, claims alleging that a federal agency acted contrary to the CVPIA must be brought under and are governed by the APA. *See San Luis & Delta-Mendota Water Auth. v. United States*, 672 F.3d 676, 699 (9th Cir. 2012) (applying APA to claim based upon the CVPIA). Likewise, claims brought under the 1908 Reclamation Act are reviewable under the APA, *S. Delta Water Agency v. U.S., Dep't of Interior, Bureau of Reclamation*, 767 F.2d 531, 535 n.6 (9th Cir. 1985), as are claims brought under NEPA and the ESA. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014).

4

judgment becomes the "mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id*. at 90.

Eastern District of California Local Rule 260(a) directs that each motion for summary judgment shall be accompanied by a "Statement of Undisputed Facts" that shall enumerate each of the specific material facts on which the motion is based and cite the particular portions of any document relied upon to establish that fact. In APA cases, such statements are generally redundant because all relevant facts are contained in the agency's administrative record. *See San Joaquin River Grp. Auth. v. Nat'l Marine Fisheries Serv.*, 819 F. Supp. 2d 1077, 1083-84 (E.D. Cal. 2011).

### III. FACTUAL BACKGROUND

**A.   The Trinity River.**

The Trinity and Klamath River Basins drain a large area of Northern California and Southern Oregon. The Trinity River is the largest tributary to the Klamath River, with their confluence lying at Weitchpec, approximately 44 miles upstream of the mouth of the Klamath River. *See Westlands Water Dist. v. U.S. Dept. of Interior*, 376 F.3d 853, 860-61 (9th Cir. 2004). The stretch of the Klamath below the confluence has been referenced by the parties as the "lower Klamath."

The Trinity River flows through the Hoopa Indian Reservation, which also encompasses a small stretch of the upper Klamath River[5] as the Klamath flows west toward its confluence with the Trinity. The confluence is just north of the Hoopa Reservation and within the boundary of the adjoining Yurok Reservation. The Yurok Reservation surrounds the lower Klamath for one mile on either side of the lower Klamath, stretching roughly from the ocean to the confluence with the Trinity. *Blake v. Arnett*, 663 F.2d 906, 908 (9th Cir. 1981); *Westlands*, 376 F.3d at 860-61; *see also* AR 03844 (map showing Hoopa and Yurok Reservations relative to Trinity and Klamath Rivers).

---

[5] The Klamath River is also blocked by several dams making up the Klamath Project, the most downstream of which is Iron Gate Dam, located in California. *Pac. Coast Fed'n of Fishermen's Assns. v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1085 (9th Cir. 2005).

1   //

2   **B.**     **The Trinity River Division.**

3        The TRD is a component of the CVP, which is, in turn, one of the largest and most complex

4   water distribution systems in the world, consisting of "an extensive system of dams, tunnels, canals, and

5   reservoirs that stores and regulates water for California's Central Valley." *Westlands*, 376 F.3d at 861.

6   The Bureau operates the TRD pursuant to state water rights permits issued by the State Water Resources

7   Control Board ("SWRCB"). *See Westlands Water Dist. v. United States*, 153 F. Supp. 2d 1133, 1144

8   (E.D. Cal. 2001), *aff'd*, 337 F.3d 1092 (9th Cir. 2003).

9        The TRD impounds the mainstem of the Trinity River initially at Trinity Dam, behind which

10  water accumulates to form the approximately 2,448,000 acre-foot[6] ("AF") Trinity Reservoir. *Westlands*,

11  376 F.3d at 861; *see also* AR 00024. A second reservoir and dam, Lewiston, which sits slightly

12  downstream of Trinity Reservoir, regulates water releases to the Trinity River. *Id*. Water can also be

13  diverted into the Sacramento River Basin through a tunnel at Clear Creek. *Id*. Water diverted through

14  Clear Creek tunnel may be made available for delivery to CVP contractors, including Plaintiffs. *Id*.

15  **C.**     **Trinity River Fishery.**

16        The Klamath River and its tributaries provide spawning and rearing habitat to substantial runs of

17  anadromous fish, including Chinook salmon, Coho salmon, and steelhead. *Westlands*, 376 F.3d at 860-

18  61. Each of these species requires varied water conditions, including depth, velocity, and temperature, at

19  different stages throughout their lives. *Id.* at 862. Depending on the species, a juvenile fish will remain

20  in the river for a few months to a few years before its size, water temperature, flow, and the daylight

21  period trigger its migration downriver to the ocean. *Id*. After three to six years in the ocean, depending

22  on the species, the fish will return to the mouth of the Klamath, and begin its migration back upriver to

23  its spawning grounds, either on the mainstem of the Klamath or in other tributaries including the Trinity

24

25

26  [6] An acre foot of water is the volume of water required to cover one acre of surface area to the depth of one foot, or the equivalent of approximately 325,851 gallons or 43,560 cubic feet. *United States v. Westlands Water Dist.*, 134 F. Supp. 2d 1111, 1139 n. 61 (E.D. Cal. 2001)

River. AR 03763-64.

Construction and operation of the TRD "radically altered" the Trinity River environment, "destroying or degrading river habitats that supported once-abundant fish populations." *Westlands*, 376 F.3d at 862. Habitat for fish has also been degraded by Klamath Project water diversions. *See, e.g.*, *Kandra v. United States*, 145 F. Supp. 2d 1192, 1197 (D. Or. 2001).

**D.   The Hoopa Valley Tribe.**

The Hoopa Valley Tribe is a federally recognized Indian tribe. 77 Fed. Reg. 47,868-1, 47,869 (Aug. 10, 2012). The Hoopa Reservation was established for the Tribe by the United States in 1864. *See Parravano v. Babbitt*, 70 F.3d 539, 542 (9th Cir. 1995). The lower twelve miles of the Trinity River, and a stretch of the Klamath River near the Trinity confluence, flow through the Reservation. The principal purpose of the Tribe's Reservation was to set aside sufficient resources of these rivers for the Indians to be self-sufficient and achieve a moderate living based on fish. *See* Doc. 44, Ex. 1 (Memorandum from John D. Leshy (M-36979), Solicitor of the Department of the Interior to the Secretary of the Interior (Oct. 4, 1993), pp. 3, 15, 18, 21, cited with approval, *Parravano*, 70 F.3d at 542).

For generations, the fishery resources of the Klamath and Trinity Rivers have been the mainstay of the life, culture, and economic livelihood of the Hoopa and Yurok. *See Parravano*, 70 F.3d at 542. When the Hoopa Reservation was created, the fishery was "not much less necessary to the existence of the Indians than the atmosphere they breathed." *Blake v. Arnett*, 663 F.2d 906, 909 (9th Cir. 1981) (quoting *United States v. Winans*, 198 U.S. 371, 381 (1905)). The Tribe holds federally-reserved fishing rights in the Klamath and Trinity Rivers, and federally-reserved water rights to support the fishery. *Parravano*, 70 F.3d at 544-46; *United States v. Adair*, 723 F.2d 1394, 1411 (9th Cir. 1984). The 2002 fish die off effectively halted tribal harvest of fish that year and impacted harvests in subsequent years. *See* AR 02372.

**E.   The Yurok Tribe.**

The Yurok is also a federally recognized Indian Tribe. 77 Fed. Reg. at 47872. The Klamath River fishery is a "vital component of the Tribe's culture[], traditions, and economic vitality." *Kandra*,

7

145 F. Supp. 2d at 1201. For generations, the Yurok have "depended on the Klamath [C]hinook salmon for their nourishment and economic livelihood." *Parravano*, 70 F.3d at 542. The Yurok Reservation "was ideally selected for the Yuroks." *Mattz v. Arnett*, 412 U.S. 481, 487 (1973). It encompasses the lower 44 miles of the Klamath River, including the confluence of the Klamath and Trinity Rivers. 25 U.S.C. § 1300i-1(c). "The Yurok people have always lived on this land on the Klamath River ... and prudently harvest and manage the great salmon runs." Yurok Constitution, Preamble.[7] Establishment of the Yurok Reservation vested the Yurok with federally reserved fishing rights. *Parravano*, 70 F.3d at 541, 545-46. These federally reserved fishing rights guarantee the Yurok a corresponding water right. *Adair*, 723 F.2d at 1410-11. The 2002 fish die off had a profound spiritual and economic effect on the Yurok people. .

**F.      1955 Trinity River Division Central Valley Project Act.**

The 1955 Trinity River Division Central Valley Project Act ("1955 Act"), Pub. L. No. 84-386, 69 Stat. 719, provides general authorization to integrate the TRD with other features of the CVP. Section 2 of the 1955 Act contains a proviso authorizing the Secretary of the Interior ("Secretary") "to adopt appropriate measures to insure the preservation and propagation of fish and wildlife, including, but not limited to the maintenance of the flow of the Trinity River below the diversion point at not less than one hundred and fifty cubic feet per second."

**G.      1981 Initiation of the Trinity River Flow Evaluation Study.**

In 1981, the Secretary issued a decision initiating the Trinity River Flow Evaluation Study ("TRFES") to determine appropriate flows and other measures to restore the Trinity River's fishery. Doc. 51-4, Secretarial Issue Document, Trinity River Fishery Mitigation (Jan. 14, 1981) ("1981 SID"). The 1981 SID explained that impacts to the Trinity and Klamath fisheries caused by diversion of water from the TRD raised issues of concern to the Hoopa and Yurok.

Since completion of the Division, over 80% of the mean runoff of the

---

[7] Available at http://www.yuroktribe.org/government/councilsupport/documents/Constitution.pdf (last visited September 29, 2014).

Trinity watershed above Lewiston Dam has been diverted to the Sacramento watershed for agricultural, hydroelectric, and other uses. This diversion has been accompanied by a severe decline in anadromous fish runs in the Trinity and Klamath Rivers. At issue are the quantity of water to be diverted and the quantity to be allowed to flow through its natural course for preservation and enhancement of anadromous fish runs on the Trinity and Klamath Rivers. Lead Assistant Secretary for this SID is the Assistant Secretary —Indian Affairs because of the federal trust responsibility to protect the fishing rights of the Hupa and Yurok tribes of the Hoopa Valley Indian Reservation.

*Id*. at A-4. The 1981 SID concluded that the Secretary's trust responsibility to the Hoopas and Yuroks, combined with applicable federal laws, required the "restoration of the river's salmon and steelhead resources to pre-project levels." *Id*. at A-17.

**H.    1984 Trinity River Basin Fish and Wildlife Management Act.**

In 1984, Congress passed the Trinity River Basin Fish and Wildlife Management Act ("1984 Act"), Pub. L. No. 98-541, 98 Stat. 2721, which directed the Secretary to implement a management program "for the Trinity River Basin designed to restore the fish and wildlife populations in such basin to the levels approximating those which existed immediately before the start of construction [of the Trinity River Division] and to maintain such levels." *Id*. at § 2. The 1984 Act called for rehabilitation of fish habitat in both the "Trinity River between Lewiston Dam and Weitchpec," as well as "in tributaries of such river below Lewiston Dam and in the south fork of such river." *Id*.

**I.    1992 Central Valley Project Improvement Act.**

In 1992, Congress passed the CVPIA, which lists among its purposes "to protect, restore, and enhance fish, wildlife, and associated habitats in the Central Valley and Trinity River Basins." CVPIA § 3402(a).[8] Among other things, CVPIA § 3406(b)(23) directs the Secretary of the Interior to maintain certain minimum instream flows in the Trinity River "to meet Federal trust responsibilities to protect the fishery resources of the Hoopa, and to meet the fishery restoration goals of the Act of October 24, 1984, Pub. L. 98-541." From 1992-1996, CVPIA § 3406(b)(23) set a default minimum instream flow at "not

---

[8] The entire text of the CVPIA is available at: http://www.usbr.gov/mp/cvpia/title_34/public_law_complete.html (last visited August 18, 2014).

less than 340,000 acre-feet per year," with the further instruction that this default minimum flow could be increased based upon a flow evaluation study and with the concurrence of the Hoopa. CVPIA § 3406(b)(23) also called for completion of the TRFES by a date certain and required the Secretary to implement any recommended increases to the default minimum flows so long as the Hoopa concurred in those recommendations.

**J.**     **1996 Reauthorization of the Trinity River Basin Fish and Wildlife Management Act.**

In 1996, Congress reauthorized and amended the 1984 Trinity River Basin Fish and Wildlife Management Act. Pub. L. 104-143, 110 Stat. 1338 ("1996 Reauthorization"). The 1996 Reauthorization expanded the scope of the 1984 Act's rehabilitation mandate to include "the Klamath River downstream of the confluence with the Trinity River." *See id*. at § 3.

**K.**     **1999 Trinity River Flow Evaluation Study.**

In 1999, the U.S. Fish and Wildlife Service ("FWS") and the Hoopa released a Final Report on the TRFES, representing the completion of the flow evaluation study called for in the 1981 SID. AR 03710-04222. The TRFES recommended that "[r]ehabilitiation of the mainstem Trinity River can best be achieved by restoring processes that provided abundant complex instream habitat prior to construction and operation of TRD." AR 03738. Specifically, the TRFES recommended varying inter-annual flows unique to each water year class, ranging from 368,800 AF in Critically Dry years to 815,200 AF in Extremely Wet years. AR 03739. It was further recommended that these inter-annual variations be complemented by within-year (i.e., seasonal) flow variability, including the implementation of short, peak releases during all water year classes (except Critically Dry), followed by "bench" flow periods designed to transport fine sediment flows mobilized by the peak flows. *Id*. Recommended releases were also designed to provide appropriate temperature conditions for outmigrating salmonids. AR 03740. Activities to rehabilitate physical "channel" conditions along the mainstem of the Trinity River were also planned, including mechanical removal of "vegetation at strategic locations to promote alluvial process necessary for the restoration and maintenance of salmonid populations," and sediment management activities designed to supplement coarse sediment and prevent

10

the buildup of fine sediment in riparian areas below Lewiston Dam. AR 03740-41. Finally, the TRFES recommended implementation of an "Adaptive Environmental Assessment and Management Program" to guide future restoration activities and adjust efforts in light of "uncertainty over how the river and the fishery resources will react to the proposed recommendations." AR 03744.

**L.** **Record of Decision for Trinity River Mainstem Fishery Restoration.**

Following completion of the TRFES, the Department of the Interior initiated an environmental review process to develop and assess alternatives to restore the Trinity River. *See* 57 Fed. Reg. 27,060-02 (June 17, 1992). As part of this process, the Secretary issued a draft EIS pursuant to NEPA. 64 Fed. Reg. 57,451-01 (Oct. 25, 1999). Following public comment, the Secretary issued the TRROD in December 2000, which adopted the preferred alternative set forth in the EIS. AR 03003-03045.

Among other things, the TRROD sets forth the volume of water to be released to provide instream flows below Lewiston Dam on the Trinity River in various water year types. AR 03014 at 12. It also clearly indicates that while "the schedule for releasing water on a daily basis … may be adjusted … the annual flow volumes … may not be changed." *Id*.

**M.** **History of the Challenged FARs.**

In the fall of 2002, a fish die-off occurred in the lower Klamath River and within the Yurok Reservation. AR 00016. Federal, tribal, and state biologists concluded that pathogens were the primary cause and that warm water and low flow conditions, combined with high fish density, contributed to the outbreak. *Id*. FWS estimated that over 34,000 fish, mainly fall run Chinook, died from the disease outbreak, but noted that its estimate was a conservative one. AR 02895, 02896. Actual losses may have been more than double that number. AR 02535.

Following the 2002 fish die-off, Reclamation released TRD flows in excess of the TRROD limits in 2003 (34,000 AF) and in 2004 (36,200 AF) in an effort to avoid a repeat of 2002 conditions. AR 01367.  In those years, Reclamation took action to ensure that Plaintiffs and other CVP contractors would not suffer water supply losses as a result of the leases. AR 00551.

Low flow conditions and projected high fish densities again coincided in 2012. AR 00016. In

11

April 2012, a subgroup of the Trinity River Restoration Program's ("TRRP") Flow Work Group developed recommendations to establish thresholds for actions aimed at preventing any fish die-off and provide recommendations for preventative actions. AR 01179. Based on those flow recommendations, in early July 2012, Reclamation issued a Draft Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") for a 2012 Lower Klamath River Late Summer Flow Augmentation. AR 01312, AR 01319. On July 27, 2012, then-Regional Director Don Glaser sent a letter to Plaintiffs in which Reclamation made three commitments regarding the proposed TRD releases. First, Reclamation promised that if Plaintiffs did not dispute the proposed action, Reclamation would not assert that Plaintiffs had waived any claims that Reclamation lacked statutory authority to carry out the proposed action. AR 01204. Second, Reclamation indicated it would "identify and implement mitigation measures to ensure that this action does not have a water supply impact to [CVP] water contractors in the 2013-14 contract year, subject to provisions of Federal and State Law." *Id.* Finally, Reclamation indicated it "will be developing a long-term strategy for addressing fall fish needs on the Lower Klamath River." *Id.*

Reclamation issued a final EA and FONSI regarding the 2012 FARs on August 10, 2012. AR 01174, AR 10167. In August and September 2012, Federal Defendants made releases from the TRD of 39,000 AF for the purpose of "reduc[ing] the likelihood, and potentially reduc[ing] the severity, of any fish die-off in 2012." AR 00016, 01179. The 2012 releases were in excess of the 647,000 AF volume limit for "normal" water years set by the TRROD by 39,000 AF. Doc. 103 (Fed. Defs' Answer) at ¶ 106.

In April 2013, the Pacific Fishery Management Council recommended actions aimed at preventing a fish die-off in 2013, including FARs. AR 00564-67. In mid-July 2013, Reclamation issued a Draft EA/FONSI regarding FARs for late summer 2013. AR 00371-401; AR 00361-370. Plaintiffs and others provided substantial comments on the draft environmental documents by July 31, 2013, arguing, among other things, that an EIS was required. AR 00057-352. The final 2013 EA/FONSI issued on August 6, 2013. AR 00001, 00012. The 2013 EA estimated that the 2013 FARs would include the release of 62,000 AF of TRD stored water, plus an additional 8,000 AF if Federal Defendants extended the release period to September 30, 2013. AR 00020-21. In addition, the 2013 EA estimated the release of up to another 39,000

1  AF of TRD storage if the Yurok Indian Tribe detected an outbreak of disease, for a total of up to 109,000 AF

2  in excess of the volume set by the TRROD for a dry year. *Id.*

3      As with the 2012 FARs, the stated purpose of the 2013 releases was to "reduce the likelihood,

4  and potentially reduce the severity, of any Ich epizootic event that could lead to associated fish die off in

5  2013" in the lower Klamath River. AR 00016-17. Reclamation offered the following as "Legal and

6  Statutory Authorities and Jurisdiction Relevant to the Proposed Federal Action":

7          The TRD Central Valley Project Act of 1955 (P.L.84-386) provides the
           principal authorization for implementing the Proposed Action.
8          Specifically, Section 2 of the Act limits the integration of the Trinity River
           Division with the rest of the Central Valley Project and gives precedence
9          to in-basin needs, including that "the Secretary is authorized and directed
           to adopt appropriate measures to insure preservation and propagation of
10         fish and wildlife…"

11 AR 00017. Reclamation also indicated that the proposed action would protect Indian trust assets:

12         Under the No Action Alternative, any affects to ITA have been previously
           described in the TRMFR EIS/EIR. As previously mentioned, the inherent
13         uncertainties of events of this nature make it difficult to accurately
           quantify the risk of an epizootic outbreak to the large run of returning fall
14         Chinook salmon associated with implementation of the No Action
           Alternative. However, if a large scale fish die-off similar to 2002 were to
15         occur in late summer 2013, regardless of apparent causes, it would be
           devastating for the tribal trust fisheries in the Klamath and Trinity Rivers.

16                                         ***

17         Under the Proposed Action, it is expected that the risk of disease
18         vulnerability to the large returning run of fall Chinook salmon to the lower
           Klamath River in the late summer would be decreased, relative to the No
19         Action Alternative. In turn, the risk to the tribal trust fishery would be
           expected to decrease. In 2003, 2004 and 2012, supplemental flows were
20         implemented, and general observations were that the sustained higher
           releases from mid-August to mid-September in each year coincided with
21         no significant disease or adult mortalities. However, as previously
           mentioned, the expected decrease in risk associated with the Proposed
22         Action cannot be accurately quantified.

23 AR 00036.

24      Reclamation also evaluated the effects of the proposed 2013 FARs on ESA-listed species under

25 the jurisdiction of the National Marine Fisheries Service ("NMFS"), including the Southern

26 Oregon/Northern Sacramento California Coasts ("SONCC") coho salmon in the Klamath River Basin,

and Sacramento River winter-run Chinook salmon, Central Valley spring-run Chinook salmon, Central

Valley steelhead, and Southern Distinct Population Segment of North American Green Sturgeon. AR

00053.

Although the EA estimated that up to 62,000 AF of water would be needed to maintain the

minimum target flow from August 15-September 21, 2013, AR 00020, due to a delay in the action by

court order as well as actual hydrologic conditions, only approximately 17,500 AF was released as part

of the 2013 FARs. Fed. Defs.' Answer at ¶ 51.

## IV. DISCUSSION

### A.   Standing.

Federal Defendants challenge Plaintiffs' standing to bring any of the claims in this case. Doc.

120 at 15-19.

#### 1.   General Standard.

Standing is a judicially created doctrine that is an essential part of the case-or-controversy

requirement of Article III. *Pritikin v. Dep't of Energy*, 254 F.3d 791, 796 (9th Cir. 2001) (citing *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "To satisfy the Article III case or controversy

requirement, a litigant must have suffered some actual injury that can be redressed by a favorable

judicial decision." *Iron Arrow Honor Soc. v. Heckler*, 464 U.S. 67, 70 (1983). "In essence the question

of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of

particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

To have standing, a plaintiff must show three elements.

> First, the plaintiff must have suffered an "injury in fact" - an invasion of a
> legally protected interest which is (a) concrete and particularized and (b)
> actual or imminent, not conjectural or hypothetical. Second, there must be
> a causal connection between the injury and the conduct complained of -
> the injury has to be fairly traceable to the challenged action of the
> defendant, and not the result of the independent action of some third party
> not before the court. Third, it must be likely, as opposed to merely
> speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560-61 (internal citations and quotations omitted). The Supreme Court has described

14

a plaintiff's burden of proving standing at various stages of a case as follows:

> Since [the standing elements] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.

*Id.* at 561.

A plaintiff is not required to prove that he would succeed on the merits to summarily adjudicate his standing to sue. *Farrakhan v. Gregoire*, 590 F.3d 989, 1001 (9th Cir. 2010) (granting summary judgment and noting that "[w]hether Plaintiffs can succeed on their [ ] claim is irrelevant to the question whether they are entitled to bring that claim in the first place"), *rev'd on other grounds,* 623 F.3d 990 (9th Cir. 2010).

Standing is evaluated on a claim-by-claim basis. "A plaintiff must demonstrate standing 'for each claim he seeks to press' and for 'each form of relief sought.'" *Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 969 (9th Cir. 2009) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). "[S]tanding is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358, n. 6 (1996).

> The actual-injury requirement would hardly serve the purpose ... of preventing courts from undertaking tasks assigned to the political branches[,] if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy all inadequacies in that administration.

*Id.* at 357. Standing is determined by the facts in existence at the time the complaint is filed. *Clark v. City of Lakewood*, 259 F.3d 996, 1006 (9th Cir. 2001).

### 1.     **Substantive Claims.**

The First Claim for Relief alleges that the FARs violated CVPIA § 3406(b)(23) because the

releases exceeded the 453,000 AF volume limit set forth in the TRROD. FAC ¶¶ 77-83. The Second

Claim for Relief alleges that Federal Defendants violated CVPIA § 3411(A) and 43 U.S.C. § 383 by

implementing the 2013 FARs without first obtaining a modification of the permitted place of use under

the State water rights permits applicable to the TRD. *Id*. at ¶¶ 84-91.

### a.  **Injury-in-Fact.**

When Plaintiffs filed this action on August 7, 2013, the proposed 2013 FARs included plans to

release of up to 109,000 AF of water above and beyond the 453,000 AF upper limit for the relevant

water year type in the TRROD. *See* AR 00004. The FARs thus threatened to create a "hole" in water

storage at Trinity Reservoir of up to 109,000 AF. During the TRO/PI proceedings, Ronald Milligan, the

manager of the Bureau's Central Valley Operations Office, confirmed that there was "about a 50%

chance that the entire combined storage deficit of the 2012 and 2013 flow augmentation actions will

remain in the spring of 2014 at Trinity and Shasta Reservoirs." Doc. 52, Declaration of Ronald Milligan

("Milligan Decl."), at ¶ 10. Relatedly, Mr. Milligan also indicated that there was only "a 10% chance

that there [would] be no cumulative effect on the combined storage of Trinity and Shasta Reservoirs."

*Id*. While admitting it was "difficult to predict definitively if or how the combination of the

augmentation releases in 2012 and 2013 will impact 2014 CVP allocations ... there [was] about a 10%

chance that there [would] be no impact to CVP allocations or supplies in 2014, [while there was] a 50%

chance ... [that the loss in storage] could result in the loss of about 70,000 - 80,000 [AF] of potential

supply to the CVP as a whole." *Id*. at ¶ 11. According to Mr. Milligan, "identifying how any particular

CVP contractors ... would be affected by this loss would depend on actual operating conditions in 2014."

*Id*. James Snow, a civil engineer and part-time employee of Westlands, indicated that, absent "very

unusually wet conditions," Trinity Reservoir would not refill by the end of May 2014. Declaration of

James Snow ("Snow Decl."), Doc. 26, at ¶ 42. Mr. Snow further estimated that then-projected storage

conditions would likely result in lower initial allocations to south-of-Delta CVP contractors. *Id*. at ¶ 47.

Federal Defendants correctly point out that, despite the FARs, Reclamation retained sufficient

operational flexibility to satisfy all temperature and flow requirements for Central Valley species. Doc.

16

120-1 at 17 (citing AR 00053-54). While this may be true, this has nothing to do with Plaintiffs' asserted primary injury: the loss of water supply.[9] The Ninth Circuit recognizes that "the loss of affordable irrigation water for ... agricultural lands" is an injury-in-fact, *San Luis & Delta–Mendota Water Auth. v. United States*, 672 F.3d 676, 701 (9th Cir. 2012), and that "the adverse consequences flowing from a reduction in water delivery are concrete and particularized and actual or imminent." *Id* (internal quotations and citation omitted). The water loss need not be enormous to qualify. *Id.* at 701-02 (finding standing when Reclamation withheld 9,000 AF of water pursuant to its authority under CVPIA § 3406(b)(2)). The impacts to Plaintiffs' members from reduced water supply allocations, including land fallowing, increased groundwater pumping and its attendant effects, increased soil salinity, increased energy use, permanent crop damage, unemployment, and reduced air quality, have been well-documented in multiple cases in this Court. Declaration of Russ Freeman ("Freeman Decl."), Doc. 22 at ¶¶ 11-26; Declaration of Daniel G. Nelson ("Nelson Decl."), Doc. 24 at ¶¶ 18, 22-24; *see also Consol. Salmonid Cases*, 713 F. Supp. 2d 1116, 1151-53 (E.D. Cal. 2010). The injury-in-fact requirement is satisfied as to Plaintiffs' substantive claims, for which standing is grounded upon loss of irrigation water.

### b.   Causation.

The causation element requires that the injury be "fairly traceable to the challenged action of the defendant" and not "the result of the independent action of some third party not before the court." *San Luis*, 672 F.3d at 702. Plaintiffs need not demonstrate that Federal Defendants' actions are the "proximate cause" of Plaintiffs' injuries. Rather, "plaintiffs must establish a line of causation between defendants' action and their alleged harm that is more than attenuated." *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011).

> A causal chain does not fail simply because it has several "links," provided those links are "not hypothetical or tenuous" and remain "plausibi[le]." *Nat'l Audubon Soc., Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002) (citing with approval *Autolog Corp. v. Regan*, 731 F.2d 25, 31

---

[9] Federal Defendants also complain that Plaintiffs' declarants speak only of past harm. Doc. 120-1 at 18 (citing *Gwaltney of Smithfield v. Chesapeake Bay Found.*, 484 U.S. 49, 57 (1987) for the proposition that federal courts lack jurisdiction over "wholly past violations"). But this argument conflates the issue of standing with the issue of mootness, which is addressed separately herein.

(D.C. Cir. 1984) ("What matters is not the 'length of the chain of causation,' but rather the 'plausibility of the links that comprise the chain.'")). In cases where a chain of causation "involves numerous third parties" whose "independent decisions" collectively have a "significant effect" on plaintiffs' injuries, the Supreme Court and this court have found the causal chain too weak to support standing at the pleading stage. *See Allen v. Wright*, 468 U.S. [727,] 759 [(1984) (abrogated on other grounds by *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014).]; [citation].

*Id*. In sum, Plaintiffs may not "'engage in an ingenious academic exercise in the conceivable' to explain how defendants actions caused his injury." *Id*. at 1068 (quoting *United States v. Students Challenging Regulatory Agency Procedures* (SCRAP), 412 U.S. 669, 689-90 (1973)).

At the summary judgment stage, "[t]he causal connection put forward for standing purposes cannot be too speculative, or rely on conjecture about the behavior of other parties, but need not be so airtight .... as to demonstrate that the plaintiffs would succeed on the merits." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108, 1120 (9th Cir. 2004), opinion amended and superseded on other grounds, 402 F.3d 846. The district court in *Nat'l Wildlife Fed'n v. Fed. Emergency Mgmt. Agency*, 345 F. Supp. 2d 1151 (W.D. Wash. 2004), succinctly reviewed the spectrum of Ninth Circuit rulings on the issue:

> In *Ocean Advocates*, the link between a dock extension and increased tanker traffic and, as a result, the risk of an oil spill was "not tenuous or abstract" either considered alone or in tandem with other industrial projects where the parties agreed that the dock extension would lead to increased traffic over time, even though other factors would also cause additional tanker traffic and would increase the risk of an oil spill. 361 F.3d at 1120. In *Nat'l Audubon Soc'y v. Davis*, the injury to birds was held to be "fairly traceable" to a ban on the use of leghold traps because the removal of the traps would likely lead to a larger population of predators, which in turn would decrease the number of birds. 307 F.3d at 849. However, in *Bell v. Bonneville Power Admin*. ("BPA"), a payment made by BPA to third parties to amend a contract to reduce the amount of power BPA was required to supply was not sufficient to prove that the contract enabled the third parties to stay in business when no facts other than the fact of payment were given to demonstrate causation. 340 F.3d 945, 951 (9th Cir. 2003).

*Id*. at 1163.

In *San Luis v. U.S. Dept. of Interior* ("*San Luis v. DOI II*"), causation was present because the

Bureau's decision to release water for environmental purposes resulted in a "hole" in storage at San Luis Reservoir, which in turn increased the risk of reduced water allocations the following year. 905 F. Supp. 2d 1158, 1172 (E.D. Cal. Oct. 17, 2012). Federal Defendants argue the present circumstances are distinguishable from those in *San Luis v. DOI II* where "hydrologic conditions likely to alleviate any such harm were in fact both unpredictable and quite unusual." *Id*. at 1171 (internal quotation and citation omitted). In *San Luis v. DOI II*, causation was established because evidence showed it was more likely than not that the "hole" in storage would fill and federal defendants produced no evidence to the contrary. *Id*. at 1172.

Here, Federal Defendants argue that Plaintiffs' allegations of harm "amount[] to [] vauge allusion[s] to the possibility of more water for allocations without the augmentation release." Doc. 120-1 at 18. But, as discussed above in the context of injury-in-fact, Plaintiffs' allegations are more than just vague allusions. The record demonstrates that, at least as of the time of filing this suit, absent very unusual hydrologic conditions, Trinity Reservoir would not refill, the "hole" in storage caused by the 2013 FARs would remain, and there would be a 50% chance that the loss in storage would result in the loss of potential water supply to Plaintiffs. Plaintiffs have satisfied the causation requirement with respect to their substantive claims.

        c.      **Redress.**

Plaintiffs also bear the burden of proving that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). When Plaintiffs filed this action, an injunction could provide relief. Moreover, declaratory relief prohibiting future instances of the challenged conduct would redress the possibility of future injury. *See San Luis v. DOI II*, 905 F. Supp. 2d at 1173.

        d.      **Organizational Standing/Standing Declarations.**

An organization can establish standing to sue on behalf of its individual members if: (1) its members would otherwise have standing to sue in their own right; (ii) the interests it seeks to protect are germane to the organization's purpose; and (iii) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342–43 (1977); *see also Friends of the Earth*, 528 U.S. at 181; *United Union of*

1   *Roofers, Waterproofers, and Allied Trades No. 40 v. Ins. Corp. of Am.*, 919 F.2d 1398, 1400 (9th Cir.

2   1990).

3       Federal Defendants object to Plaintiffs' reliance on certain declarations to establish their

4   organizational standing. Doc. 120-1 at 16. Of the nine declarations cited in Plaintiffs' opening brief, six

5   were submitted by individual farmers and a seventh from an elementary school principal. Docs. 17-21 &

6   23 (cited in Doc. 113 at 8 n.1). While there is no basis upon which the Court could consider the

7   declaration submitted by Baldomero Hernandez, the Principal and Superintendent for Westside

8   Elementary School District, to establish <u>Plaintiffs'</u> standing, the other challenged declarations are

9   unquestionably admissible for that purpose. Rod Cardella owns and operates Cardella Ranch, a farm

10  located within the Westlands service area (Doc. 18 at ¶ 2); Todd Allen is a farmer who relies on

11  Westlands as his sole source of water supply (Doc. 21 at ¶¶ 1-2); James Anderson is a farmer, and a

12  partner in Condor Farms located within the Westlands service area (Doc. 23 at ¶ 1); Marty Acquistapace

13  is the farm manager of Blackburn Farming Co., which farms within the Westlands service area (Doc. 17

14  at ¶ 2); and William Bourdeau is the Executive Vice President of Harris Farms, Inc., which farms in the

15  Westlands service area (Doc. 20 at ¶ 2). Westlands is a California water district formed pursuant to

16  California Water Code section 34000, *et seq*. *See* Cal. Water Code § 37850 (discussing operation of

17  Westlands as provided by law for California water districts generally). Based upon the analysis of the

18  elements of Article III standing provided above, the individual farmer declarants would have standing to

19  sue in their own right, as they ultimately would suffer direct injury through loss of water supply.

20      While the individual farmer declarants are not "members" in a traditional sense of Plaintiffs'

21  organizations, the Ninth Circuit has previously permitted California agencies to represent the water users

22  they serve. In *Central Delta Water Agency v. United States*, 306 F.3d 938, 951 (9th Cir. 2002), for

23  example, the Central Delta Water Agency and South Delta Water Agency were permitted organizational

24  standing based upon the standing of individual plaintiffs served by those Agencies in part because each

25  Agency was charged by California law to ensure that the lands within their boundaries and their

26  constituent users had a dependable, quality water supply. *Id*. Similar provisions empower Westlands to

secure irrigation water for property owners within its boundaries. *See* Cal. Water. Code §§ 37801, 37803. Westlands, in turn, is a member of the Authority, which was formed to "supply water for reasonable and beneficial uses such as municipal, industrial, agricultural, and environmental uses to cities, farms, municipal water retailers, and other residents and landowners within their service areas." *See* Nelson Decl. at ¶ 4. Plaintiffs' participation in this lawsuit is germane to the interests those entities were formed to serve, satisfying *Hunt*'s second prong. Finally, there is no suggestion that the claim asserted or the relief requested requires the participation of individual members in the lawsuit, satisfying *Hunt*'s third prong. Plaintiffs have organizational standing.

## 2.   Procedural Claims.

The Third Claim for Relief alleges that Federal Defendants violated NEPA by failing to prepare an EIS prior to making the Flow Augmentation Releases. FAC ¶¶ 92-95. The Fourth Claim for Relief alleges that Federal Defendants failed to satisfy their ESA § 7 obligations to consult with NMFS and/or FWS regarding the FARs. *Id.* at ¶ 102.[10] Standing jurisprudence draws a distinction between "substantive" and "procedural" claims. "One who challenges the violation of 'a procedural right to protect his concrete interests can assert that right without meeting all the normal standards' for traceability and redressibility." *Natural Res. Def. Council v. Jewell*, 749 F.3d 776, 782-83 (9th Cir. 2014) (quoting *Lujan*, 504 U.S. at 572 n. 7). NEPA claims are subject to this relaxed "procedural injury" standard, *see Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011), as are alleged violations of ESA § 7(a)(2)'s consultation requirement. *Jewell*, 749 F.3d at 783.

To satisfy the injury-in-fact requirement with respect to a procedural injury claim, a plaintiff "must show that the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 779 (9th Cir. 2006). In other words, Plaintiffs must establish that their interests "fall within the zone of interests

---

[10] The FAC also alleges that Federal Defendants' failure to consult under ESA § 7 will result in a violation of ESA § 9's prohibition against the take of listed species. FAC ¶ 103. However, Plaintiffs do not mention Section 9 in their motion for summary judgment. *See* Doc. 125 at 5-6.

protected by the statute at issue." *Jewell*, 749 F.3d at 783.

> [D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing. Only "a person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy."

*Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009) (quoting *Lujan*, 504 U.S. at 572 n. 7). If a plaintiff is able to demonstrate injury in fact, the litigant "need only demonstrate that he has a procedural right that, if exercised, could protect his concrete interests." *Jewell*, 749 F.3d at 783.

### a.   NEPA Claim.

With respect to NEPA, the procedures in question, namely those requiring preparation of an EIS whenever a federal agency undertakes a "major Federal action[] significantly affecting the quality of the human environment," 42 U.S.C. § 4332(C), are designed to "protect some threatened concrete interest ... that is the ultimate basis of his standing." *Pit River Tribe,* 469 F.3d at 779.

As discussed above, the record establishes that at the time Plaintiffs file their suit, there was a significant possibility that implementation of the FARs in 2013 would cause reduced deliveries in 2014. Assuming the FARs had resulted in reduced deliveries to Plaintiffs, it is well established that such reductions could have resulted in harm to the environment in which Plaintiffs' members operate. *See generally San Luis & Delta-Mendota Water Auth. v. Salazar*, 686 F. Supp. 2d 1026, 1050 (E.D. Cal. 2009). For example, reduced water deliveries can result in increased groundwater usage, which, in turn, can result in subsidence problems. Nelson Decl. ¶ 18. In addition, available groundwater may be so saline that its use can contribute to salt buildup in the soil. *Id*. NEPA's stated purposes include broad goals that readily encompass Plaintiffs' interests in preventing the environmental harms associated with reduced water deliveries. Among other things, NEPA calls for federal agencies to

> use all practicable means ... to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may –
>
> > (1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

> (2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;
>
> (3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;
>
> (4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;
>
> (5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and
>
> (6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

42 U.S.C. § 4331(b).

Federal Defendants do suggest that Plaintiffs cannot meet the relaxed causation/redress standards applicable to their NEPA claim because Plaintiffs cannot show Federal Defendants' actions actually resulted in harm to Plaintiffs:

> Plaintiffs here fail to show that the alleged failure of Reclamation to prepare an EIS or engage in more ESA consultation actually resulted in its being able to supply a lesser amount of water. Nor do they suggest, let alone demonstrate, that more NEPA analysis or more ESA consultation would have resulted in a lesser amount of water for the releases or the realization that the releases were not needed. Plaintiffs cannot make any such showings. The record shows that after considering its authority to make releases and the potential environmental impacts, and after coordination with NMFS to develop the action and fully considering its effects on listed coho salmon and Central Valley salmonids and green sturgeon, Reclamation determined that this volume of water was needed to prevent a massive die-off of fall-run Chinook and other salmonids in the lower Klamath River. Reclamation's substantive conclusions about the need for this amount of water and the environmental impacts of that release and impacts to listed fish were reasonable and undisputed.

Doc. 120-1 at 19. While it is true that the scientific basis for the FARs is undisputed, Federal Defendants apply the incorrect standard. For standing purposes, a litigant seeking to vindicate a procedural right "need only demonstrate that he has 'a procedural right that, if exercised, could protect his concrete interests." *Jewell*, 749 F.3d at 783 (emphasis in original) (citation omitted). Contrary to Federal Defendants' argument, the Court believes a procedural remedy could protect Plaintiffs' concrete

23

interests. For example, an alternatives analysis could have caused Reclamation to consider means by which replacement water could have been delivered to Plaintiffs, as was the case in 2003. Plaintiffs have standing to pursue their NEPA claim.

### b.  ESA § 7 Claim.

As noted above, Plaintiffs may satisfy the injury-in-fact requirement by showing "that the procedures in question are designed to protect some threatened concrete interest of [theirs] that is the ultimate basis of [their] standing." *Pit River Tribe,* 469 F.3d at 779. Plaintiffs maintain they have a concrete interest in ensuring Reclamation consults regarding the impacts of the FARs on ESA-listed species "because deterioration in the condition of those species results in more stringent regulation and reduction of CVP water supply." Doc. 125 at 6. This is a clear admission that their direct interest is in ensuring the continued delivery of water to their members, not in species protection. The ESA § 7 consultation procedures at issue directly promote the goal of species protection. *See Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1225-26 (9th Cir. 2008). Therefore, a plaintiff organization with the stated purpose of preserving an endangered species may invoke ESA § 7 procedural protections to achieve standing. *Id*. But, Plaintiffs do not even argue that the text of ESA § 7 could support a finding that its procedures are designed to protect Plaintiffs' ultimate interest in avoiding additional restrictions to their water supply.[11]

But, even if Plaintiffs were able to demonstrate that the procedures set forth in ESA § 7 were designed to protect the type of concrete interest, asserted, they have failed to "establish the reasonable probability of the challenged action's threat to [their] concrete interest." *Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001). This is a causation requirement that applies even under the relaxed standard applicable to procedural injury claims. *Id*. at 976 (indicating that *Hall* was analyzing a procedural

---

[11] The Court acknowledges that there is authority to support the proposition that ESA § 7's "best available science" standard encompasses a range of interests, including an impacted litigant's interest in avoiding additional ESA regulatory burdens. *See Bennet v. Spear*, 520 U.S. 154, 176-77 (1997). But, the parties have not cited and the Court could not locate any similar authority related to ESA § 7's consultation requirement.

claim); *see also Ctr. for Food Safety v. Vilsak*, 636 F.3d 1166, 1171 n.6 (9th Cir. 2011) (explaining that the "reasonable probability" standard for procedural injury cases survived the Supreme Court's decision in *Summers*). Plaintiffs argue that the FARs "threatened to impair the status and recovery of listed fish" because the FARs "reduce the total volume of TRD water available to maintain cold temperatures for ESA-listed salmonids in the Sacramento River." Doc. 125 at 6. However, the record does not support this assertion. The declarations of Daniel G. Nelson, cited by Plaintiffs, serve only to establish the general proposition that Plaintiffs have on other occasions been subjected to water supply reductions as a result of regulatory activity to protect listed species. *See* Doc. 126, Second Declaration of Daniel G Nelson ("Second Nelson Decl.") at ¶¶ 3-4; Nelson Decl. at ¶¶ 6, 8, 9.

Plaintiffs next cite their own letter to the Bureau in response to the issuance of the Draft FONSI/EA for the 2013 FARs, in which Plaintiffs assert that "low reservoir inflow and increased storage withdrawal is depleting the cold water pool in the reservoirs that is important to provide adequate instream fishery habitat for anadromous fish in the rivers through the summer and fall." AR 00074. But, even if this unsupported argument is true, that the cold water pool is "important" and that various conditions in 2013 were "depleting" that cold water pool does not establish that it is "reasonably probable" that the FARs will harm listed species.

Plaintiffs also cite pages 5373 and 5374 of the Supplemental Administrative Record ("SAR"), a May 24, 2013 letter from the Bureau and California's Department of Water Resources ("DWR"), which operates the State Water Project, to the SWRCB, requesting that the SWRCB "acknowledge that the water year classification for the Sacramento Valley [calculated as "Dry" based upon a formula contained in] Revised Water Rights Decision 1641 (D-1641) does not accurately reflect the unprecedented dry conditions experienced in 2013." Instead of requiring the CVP and SWP to meet "Dry" year objectives, the Bureau and DWR requested that the SWRCB permit operations to meet "Critical" water year objectives, a modification the Bureau and DWR indicated was "important to provide adequate instream fishery habitat for anadromous fish in the rivers through the summer and fall." *Id*. But, Plaintiffs do not explain how this request relates to the likelihood that cold water pool resources would be insufficient as

a result of the FARs. Federal Defendants have consistently maintained that the FARs would not change Reclamation's ability to meet all flow and temperature requirements. AR 00053-54. Plaintiffs have not met their burden to establish to that the FARs were likely to harm their protected interests to any degree of probability, let alone to a "reasonably probable" degree. Therefore, Plaintiffs lack standing to pursue their ESA § 7 claim.

In sum, Federal Defendants' motion for summary judgment that Plaintiffs lack standing to sue is GRANTED as to the ESA claim and DENIED as to all other claims; Plaintiffs' cross motion that Plaintiffs have standing is DENIED as to the ESA claim and GRANTED as to all other claims.

**B.**    **Mootness.[12]**

   **1.**    **General Standard.**

An issue is moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000). "The underlying concern is that, when the challenged conduct ceases such that there is no reasonable expectation that the wrong will be repeated, then it becomes impossible for the court to grant any effectual relief whatever to the prevailing party." *Id.* (internal citations and quotations omitted). If the parties cannot obtain any effective relief, any opinion about the legality of a challenged action is advisory. *Id.* "Mootness has been described as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n. 22 (1997) (internal citation and quotation omitted). "[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Id.* at 67.

Even if a case is technically moot, a case may nevertheless be judiciable if one of three exceptions to the mootness doctrine applies: (1) where a plaintiff "would suffer collateral legal

---

[12] No Defendant has challenged this Court's jurisdiction on the ground that any of the claims in this case are moot. Nevertheless, because Plaintiffs' raise the issue in their opening brief and because the Court has a sua sponte duty to ensure the existence of jurisdiction, *see Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 593 (2004) ("[I]t is the obligation of both district court and counsel to be alert to jurisdictional requirements."), the Court addresses mootness herein.

consequences if the actions being appealed were allowed to stand"; (2) where defendant voluntarily ceased the challenged practice; or (3) for "wrongs capable of repetition yet evading review." *Ctr. for Biological Diversity v. Lohn*, 511 F.3d 960, 964–66 (9th Cir. 2007). "The party asserting mootness has a heavy burden to establish that there is no effective relief remaining for a court to provide." *In re Palmdale Hills Property, LLC*, 654 F.3d 868, 874 (9th Cir. 2011).

Having found Plaintiffs lack standing to bring their ESA claim, the Court organizes the remaining claims into two groups for purposes of analyzing mootness. First, the Court evaluates mootness as to the "substantive" claims arising under the CVPIA and various other provisions of Reclamation law. Next the Court evaluates whether the NEPA claim is moot.

### 2. **Mootness of Substantive Claims.**

#### a. **Continuing Practice.**

Plaintiffs claim that this case is not moot because the complaint challenges a "continuing practice." Doc. 113 at 10. In support of this argument, Plaintiffs cite *Forest Guardians v. Johanns*, 450 F.3d 455 (9th Cir. 1995), which addressed a challenge to the U.S. Forest Service's failure to re-initiate ESA consultation on the impact of cattle grazing pursuant to Forest Service-issued grazing permits. Each challenged grazing permit had a ten-year term and required the Forest Service annually to obtain concurrence from FWS that certain criteria governing a prior "not likely to adversely affect" finding have been met. *Id.* at 462. After the lawsuit was filed, the Forest Service did re-initiate consultation on the permits and thereafter argued that the case was moot. *Id.* at 461. The Ninth Circuit rejected this argument, concluding, among other things, that the Forest Service's actions "involved a continuing practice," as the agency continued to maintain it was not subject to certain restrictions. *Id.* at 462.[13]

The Court agrees with Plaintiffs that, at least with respect to the substantive claims, *Forest Guardians* controls here because Reclamation "has made a 'continuing practice' of declining to include

---

[13] As this Court has previously noted, the concept of a "continuing practice," the presence of which precludes a threshold finding of mootness, is distinct from the concept of a wrong that is "capable of repetition but evading review," which is an exception to mootness that permits adjudication of otherwise moot cases. *San Luis & Delta-Mendota Water Auth. v. U.S. Dep't of the Interior*, 870 F. Supp. 2d 943, 957 n.3 (E.D. Cal. 2012).

water in these release schedules for late-summer or early-fall releases, thereby setting up an annual

'emergency' when they take yet more TRD storage in excess of [TR]ROD volumes." Doc. 113 at 10.

Also, Federal Defendants continue to maintain they may make these releases even though they are above

and beyond the TRD maximum. *Id*. The substantive claims are not moot.

### b.     Capable of Repetition Yet Evading Review.

Even if the continuing practice doctrine did not apply to the substantive claims, Plaintiffs claim

that the circumstances satisfy the mootness exception for unlawful conduct that is "capable of repetition

yet evading review." *Id.* at 9. This exception "permit[s] suits for prospective relief to go forward despite

abatement of the underlying injury [in] exceptional[14] situations where the following two circumstances

[are] simultaneously present: (1) the challenged action [is] in its duration too short to be fully litigated

prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining

party would be subjected to the same action again." *Fed. Elec. Com'n v. Wisconsin Right to Life, Inc.*,

551 U.S. 449, 462 (2007) (internal citations and quotations omitted); *San Luis*, 672 F.3d at 703; *San Luis*

*& Delta-Mendota Water Auth. v. U.S. Dep't of the Interior*, 870 F. Supp. 2d 943, 959 (E.D. Cal. 2012)

("*San Luis v. DOI I*").

### (1)     Duration of the Challenged Action.

This Court has previously recognized that a temporary water management action is too short in

duration to be fully litigated prior to its expiration. *San Luis v DOI I*, 870 F. Supp. 2d at 959.

### (2)     Reasonable Expectation of Repeat Conduct.

Whether similar events occurred in the past is potentially dispositive of the application of the

"capable of repetition but evading review" exception. *Demery v. Arpaio*, 378 F.3d 1020, 1027 (9th Cir.

2004) (repeated past conduct on multiple occasions taken as evidence of likely repetition); *Natural*

*Resources Defense Council, Inc. v. Evans*, 316 F.3d 904, 910 (9th Cir. 2003) (same, noting that agency

---

[14] In line with the Supreme Court's explanation that this exception only applies in exceptional cases when the two stated conditions are met, the Ninth Circuit only applies the exception in "extraordinary cases." *West Coast Seafood Processors Ass'n v. Natural Res. Def. Council*, 643 F.3d 701, 704 (9th Cir. 2011).

repeatedly applied the same, challenged rationale, "year after year"); *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1329-30 (9th Cir. 1992) (one subsequent instance of agency relying on allegedly insufficient biological opinion sufficient to find reasonable expectation of recurrence). This Court has previously applied this exception where the challenged conduct occurred on only one prior occasion. *San Luis v. DOI I*, 870 F. Supp. 2d at 959. Therefore, even if the substantive claims in this case are moot, the capable of repetition yet evading review exception generally applies here.

### 3.     Mootness of NEPA Claim.

Plaintiffs argue Reclamation violated NEPA by failing to prepare an EIS. Doc 113 at 25-37. As explained above, the Court finds that this case is not moot, overall, because Federal Defendants' conduct represents a continuing practice and/or that the challenged action satisfies the mootness exception for conduct "capable of repetition yet evading review." However, mootness, like standing, must be evaluated on a claim-by-claim basis. *Pac. Nw. Generating Co-op. v. Brown*, 822 F. Supp. 1479, 1506 (D. Or. 1993), aff'd, 38 F.3d 1058 (9th Cir. 1994) (citing *Headwaters, Inc. v. Bureau of Land Management*, 893 F.2d 1012, 1015–16 (9th Cir. 1989) (separately addressing mootness as to different forms of relief requested)); *see also In re Pac. Lumber Co.*, 584 F.3d 229, 251 (5th Cir. 2009) (evaluating mootness on a claim-by-claim basis).

As described above, in connection with both the 2012 and 2013 FARs, Federal Defendants issued an EA/FONSI. However, Federal Defendants adopted a different interpretation of their NEPA responsibilities in connection with FARs implemented in 2014, documentation of which came before the Court in connection with the recently decided motion for injunctive relief. *See generally* Doc. 151 at 7. Specifically, Federal Defendants did not prepare an EA prior to authorizing the 2014 FARs, choosing instead to invoke an "emergency" exception to NEPA. Therefore, the Court finds that the conduct underlying Plaintiffs' NEPA claim is not a continuing practice and is unlikely to repeat itself. Therefore, the NEPA claim is moot and will not be addressed herein.

### C.     Violation of CVPIA § 3406(b)(23)/Statutory Authority for the FARs.

Plaintiffs move for summary judgment on their First Claim for Relief, brought under the APA,

which alleges that the FARs violate Federal Defendants' mandatory duty under CVPIA § 3406(b)(23) because the planned flows exceed those permitted in the TRROD, the adoption of which was called for in § 3406(b)(23). *See* FAC at ¶ 78. Federal Defendants and Defendant Intervenors cross-move for summary judgment, asserting that the FARs do not violate CVPIA § 3406(b)(23) and are, in contrast, authorized by Section 2 of the 1955 Act. The Hoopa and Yurok argue, alternatively, that the 2013 FARs were authorized pursuant to Federal Defendants' trust responsibilities to the Hoopa and Yurok. Plaintiffs also move for summary judgment that neither the 1955 Act nor Federal Defendants' trust responsibilities authorize the FARs.[15] Although these arguments overlap, for clarity of analysis, the Court will first evaluate whether the FARs violate CVPIA § 3406(b)(23) and then will examine whether Federal Defendants otherwise have authority to implement the FARs.

### 1.   Did Implementation of the 2013 FARs Violate CVPIA § 3406(b)(23)?

CVPIA § 3406(b)(23)[16] directs the Secretary to maintain certain minimum instream flows in the

---

[15] The Court notes that Plaintiff's First Claim for Relief alleges that Federal Defendants' implementation of the 2013 FARs violated the APA because the 2013 FARs exceeded the volume of water permitted to be released from Trinity Reservoir pursuant to the TRROD, the adoption of which was called for in CVPIA § 3406(b)(23). While not disputing the binding nature of the TRROD, Federal Defendants have consistently maintained in this lawsuit and during the underlying decisionmaking process that the 2013 FARs were nonetheless authorized by the 1955 Act. Accordingly, Plaintiffs moved for summary judgment that the 1955 Act did not authorize the 1955 Act. No party has objected to Plaintiffs' motion, even though this argument is not explicitly raised in any allegation in the FAC. It may be inferred from the absence of objection and the focus of the briefing that the FAC inferentially raises the issue of whether Federal Defendants had legal authority to undertake the 2013 FARs.

[16] The entire text of CVPIA § 3406(b)(23) provides:

In order to meet Federal trust responsibilities to protect the fishery resources of the Hoopa Valley Tribe, and to meet the fishery restoration goals of the Act of October 24, 1984, Pub. L. 98-541, provide through the Trinity River Division, for water years 1992 through 1996, an instream release of water to the Trinity River of not less than 340,000 acre-feet per year for the purposes of fishery restoration, propagation, and maintenance and,

(A) By September 30, 1996, the Secretary, after consultation with the Hoopa Valley Tribe, shall complete the Trinity River Flow Evaluation Study currently being conducted by the U.S. Fish and Wildlife Service under the mandate of the Secretarial Decision of January 14, 1981, in a manner which insures the development of recommendations, based on the best available scientific data, regarding permanent instream fishery flow requirements and Trinity River Division operating criteria and procedures for the restoration and maintenance of the Trinity River fishery; and

(B) Not later than December 31, 1996, the Secretary shall forward the recommendations of the Trinity River Flow Evaluation Study, referred to in subparagraph (A) of this paragraph, to the Committee on Energy and Natural Resources and the Select Committee on Indian Affairs of the Senate and the Committee on Interior and Insular Affairs and the Committee on Merchant Marine and Fisheries of the House of Representatives. If the Secretary and the Hoopa Valley Tribe concur in these recommendations, any increase to the minimum Trinity River instream fishery releases established under this paragraph and

Trinity River "to meet Federal trust responsibilities to protect the fishery resources of the Hoopa Valley

Tribe, and to meet the fishery restoration goals of the Act of October 24, 1984, Pub. L. 98-541." From

1992-1996, CVPIA § 3406(b)(23) set a default minimum instream flow at "not less than 340,000 acre-

feet per year," with the further instruction that this default minimum flow could be increased based upon

a flow evaluation study (the TRFES described above) designed to "develop[] recommendations ...

regarding permanent instream fishery flow requirements and Trinity River Division operating criteria

and procedures for the restoration and maintenance of the Trinity River fishery." CVPIA §

3406(b)(23)(A) (emphasis added). Conditioned upon concurrence of the Hoopa, which was obtained,

CVPIA § 3406(b)(23)(B) directs the Secretary to increase releases in accordance with the

recommendations of the TRFES.

As explained above, following completion of the TRFES and environmental review required by

the CVPIA, the Secretary issued the TRROD in December 2000. AR 03003-03045. Among other things,

the TRROD sets forth the volume of water to be released to provide instream flows below Lewiston

Dam on the Trinity River in various water year types. AR 03014. It also clearly indicates that while "the

schedule for releasing water on a daily basis … may be adjusted … the annual flow volumes … may not

be changed." *Id*. This indicates that the flow volumes set forth in the TRROD are maximums, as well as

minimums. This conclusion is further supported by the fact that the TRROD itself discusses numerous

environmental impacts that could result from the use of the respective flow in the Trinity River, as

opposed to transferring some of that flow (as was historically done) to the Sacramento/San Joaquin

basin. *Id*. at 03021-26. The more water dedicated to instream uses, the greater those impacts might be.

Under the TRROD, the total volume of water to be released in a "dry" water year such as 2013 is

453,000 AF. AR 3014. There is no dispute that the 17,500 AF of water released by Reclamation during

the operating criteria and procedures referred to in subparagraph (A) shall be implemented accordingly. If
the Hoopa Valley Tribe and the Secretary do not concur, the minimum Trinity River instream fishery
releases established under this paragraph shall remain in effect unless increased by an Act of Congress,
appropriate judicial decree, or agreement between the Secretary and the Hoopa Valley Tribe. Costs
associated with implementation of this paragraph shall be reimbursable as operation and maintenance
expenditures pursuant to existing law.

1  the 2013 FARs was not accounted for within the 453,000 AF dedication. Doc. 103 (Federal Defendants'

2  Answer) at ¶ 80. There is also no dispute that the 2012 FARs exceeded the TRROD volume limits that

3  year by approximately 39,000 AF. *Id.* at ¶ 106.

4       Plaintiffs maintain that the TRROD's upper limits operate as <u>absolute</u> upper limits on the volume

5  of water Reclamation may release from the TRD for instream purposes and that the FARs therefore

6  violate CVPIA § 3406(b)(23), which called for adoption of the TRROD.[17] Federal Defendants and

7  Defendant Intervenors do not dispute that the TRROD limits operate as upper limits, but argue that the

8  TRROD itself is limited in its geographic scope and therefore does not impede Reclamation's discretion

9  to provide additional flows for fish and wildlife restoration <u>below</u> the confluence of the Trinity and

10  Klamath Rivers, discretion that comes from language in the 1955 Act. Put another way, Federal

11  Defendants maintain they possess discretion to implement FARs to benefit fish <u>below</u> the confluence on

12  the lower Klamath, including fish whose lives originated upstream on the Klamath River.[18]

13       The starting point for resolving this dispute is the plain language of CVPIA § 3406(b)(23), which

14  defines the purpose of any flows allocated pursuant to its terms as follows:

15       In order to <u>meet Federal trust responsibilities</u> to protect the fishery
16  resources of the Hoopa Valley Tribe, <u>and to meet the fishery restoration goals of the Act of October 24, 1984, Pub. L. 98-541</u>, provide through the
17  Trinity River Division, for water years 1992 through 1996, an instream release of water to the Trinity River of not less than 340,000 acre-feet per
18  year for the purposes of fishery restoration, propagation, and maintenance....

19  (Emphasis added.) The reference therein to the 1984 Act merits close examination. The original version

20  of the 1984 Act directed the Secretary to implement a management program "for the Trinity River Basin

21  designed to restore the fish and wildlife populations ... to the levels approximating those which existed

22  immediately before the start of construction [of the Trinity River Division] and to maintain such levels."

23

24  [17] This is, in essence, an argument that Federal Defendants acted "not in accordance with law" or "in excess of statutory authority." 5 U.S.C. § 706(2)(A)&(B).
25  [18] Plaintiffs point out, correctly, that this Court previously held in this case in the context of Plaintiff's request for injunctive relief that the TRROD was the "culmination of Congressional activity to restore the Trinity." *See* Doc. 62 at 5. But, as
26  discussed above, rulings on questions related to likelihood of success on the merits issued in the context of injunctive relief are not binding, even under the law of the case doctrine. *See supra* note 2.

*Id*. at § 2. The 1984 version of the statutory text called for rehabilitation of fish habitat in both the

"Trinity River between Lewiston Dam and Weitchpec" as well as "in tributaries of such river below

Lewiston Dam and in the south fork of such river." *Id*; *see also Westlands*, 376 F.3d at 866.

In 1996, several years after the passage of the CVPIA, Congress reauthorized and amended the

1984 Act. The scope of the 1984 Act's rehabilitation mandate was expanded from its original call to

rehabilitate fish habitat in "the Trinity River between Lewiston Dam and Weitchpec" to call for

rehabilitation of fish habitat in "the Trinity River between Lewiston Dam and Weitchpec <u>and in the</u>

<u>Klamath River downstream of the confluence with the Trinity River.</u>" *See id*. at § 3 (new language

emphasized). This indicates that Congress believed the mandate in the original version of the 1984 Act

did not extend below the confluence to include the Klamath River.

A key question not directly addressed by any party is whether the 1992 CVPIA's reference to the

1984 Act serves as a reference to the language of the 1984 Act as that Act existed when the CVPIA was

adopted in 1992 (i.e. the original, unamended version), or as the 1984 Act would later be amended in

1996. "Under long established canons of statutory construction, statutes which incorporate other statutes

by reference are considered either 'statutes of specific reference' or 'statutes of general reference.'"

*Pearce v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor*, 603 F.2d 763, 767 (9th Cir.

1979). In *Pearce*, the Ninth Circuit cites a Seventh Circuit opinion in explaining the distinction:

> [W]hen a statute adopts the general law on a given subject, the reference is
> construed to mean that the law is as it reads thereafter at any given time
> including amendments subsequent to the time of adoption. This is to be
> contrasted with adoption by reference of limited and particular provisions
> of another statute, in which case the reference does not include subsequent
> amendments.

*Id*. (quoting *Director, Office Workers' Compensation Programs v. Peabody Coal Co.*, 554 F.2d 310, 322

(7th Cir. 1977)). For example, where a statute references a specific provision of another statute, it is

considered a "statute of specific reference" and does not include subsequent amendments. *See Horisons*

*Unlimited v. Santa Cruz-Monterey-Merced Managed Med. Care Comm'n*, 1:14-CV-00123-LJO-MJ,

2014 WL 3342565 at *8 (E.D. Cal. July 2, 2014) ("Here, 42 U.S.C. § 1396u–2(a)(3)(C) specifies the

particular provision of the Omnibus Budget Reconciliation Act ('OBRA') of 1985 that it adopts as well as the origin of that provision. Therefore, § 1396u–2(a)(3)(C) is a statute of specific reference rather than general reference, and its adoption of § 9517(c)(3) does not include subsequent amendments to § 9517(c)(3).").

Here, the CVPIA refers to the "fishery restoration goals of the [1984 Act]." CVPIA § 3406(b)(23). At first glance, CVPIA § 3406(b)(23) appears to be more generic than a typical "statute of specific reference," as it refers generally to the 1984 Act, which, in turn, focuses on fishery restoration, its title being "An Act to provide for the restoration of the fish and wildlife in the Trinity River Basin, California, and for other purposes." However, a close reading of the entirety of the 1984 Act leads the Court to conclude otherwise. Only one paragraph in Section 1 of the 1984 Act specifically references fishery restoration "goals," providing:

> The Congress finds that... the Secretary requires additional authority to implement a basin–wide fish and wildlife management program in order to achieve the long-term goal of restoring fish and wildlife populations in the Trinity River Basin to a level approximating that which existed immediately before the start of the construction of the Trinity River division.

Pub. L. 98-541, Section 1(6). Other sections of the 1984 Act call for the implementation of programs to meet this goal. The CVPIA was an extension of this process, but only incorporates the specific goal of the 1984 Act. This is a specific enough reference to render this language in the CVPIA a "statute of specific reference" that, accordingly, does not automatically incorporate subsequent amendments thereto.

*Arguendo*, if the relevant language in the CVPIA is treated as a statute of general reference and therefore that the CVPIA incorporates any updates to the 1984 Act, the CVPIA then explicitly includes within its geographic scope the lower Klamath. As discussed elsewhere in this decision, no party argues that Reclamation possesses authority to release water above and beyond the flows prescribed in the TRROD to take actions that fall within the scope of CVPIA § 3406(b)(23) and/or the TRROD. Hence, if the CVPIA's reference to the 1984 Act is treated as a statute of general reference, CVPIA § 3406(b)(23)

1   and the TRROD encompass and fulfill actions to restore fish habitat in the lower Klamath, a finding that

2   is not advocated by any party, is at odds with the approach taken by the agency subsequent to the

3   passage of the CVPIA and embodied in the TRROD, is totally inconsistent with Federal Defendants'

4   theory of authority to act in this case, and is also inconsistent with the Ninth Circuit's analysis in

5   *Westlands*. 376 F.3d at 866-67 (finding that CVPIA § 3406(b)(23) and the 1984 Act concerned the

6   Trinity River Basin).

7       The conclusion that the CVPIA reference to the 1984 Act's goals is limited in scope to the

8   Trinity River supports Defendants' general argument that CVPIA § 3406(b)(23) was focused only on

9   restoration of the <u>mainstem</u> of the Trinity River and fish and wildlife populations in the "<u>Trinity River</u>

10  <u>Basin</u>." Record documents, in turn confirm that the "Trinity River Basin" is limited to the area drained

11  by the Trinity River and its tributaries (including the South Fork of the Trinity River), <u>ending at the</u>

12  <u>confluence with the Klamath River and not including the lower Klamath itself.</u> *See, e.g.*, AR 03751

13  (1998 Flow Study Figure 2.1, a map of the "Trinity River Basin and adjacent area in northwestern

14  California" drawing a boundary around the Trinity River Basin that does not include the lower

15  Klamath).

16      The TRFES and TRROD provide independent support for Defendants' position that CVPIA §

17  3406(b)(23), which called for the 1999 TRFES and 2000 TRROD, is limited in scope to the Trinity

18  River Basin. The TRFES, jointly authored by FWS and the Hoopa Valley Tribe, discusses its own

19  limitations explicitly. AR 03978 (summarizing recommendations for "rehabilitation of the mainstem

20  Trinity River" and "restoration and maintenance of its fishery resources"); AR 03979 (describing flow

21  release that provides the "greatest amount of microhabitat in the mainstem Trinity River from Lewiston

22  Dam to Weitchpec"); AR 03980 (explaining that "recommended releases focus on [the] segment [above

23  the North Fork Trinity River] because it is most affected by releases from Lewiston Dam"); AR 03986-

24  95 (describing flow releases that provide optimal temperatures "throughout the mainstem"); AR 04016

25  (recommendations for sediment management between Lewiston Dam and North Fork Trinity River

26  confluence); AR 04019-23 (recommendations for channel rehabilitation between Lewiston Dam and

35

North Fork Trinity confluence).

The focus of the TRFES and TRROD on the Trinity River mainstem and Trinity River Basin make sense in the factual context. As explained in the TRFES, prior to construction of the TRD, the Trinity River was a "dynamic alluvial[19] river," in which plentiful salmon spawning and rearing habitat existed. AR 03735. Regulation of flows, resulting from the TRD, destroyed the alluvial features and limited both the quantity and quality of salmon habitat:

> Reduced flows, loss of coarse sediment, and riparian encroachment caused the mainstem river downstream from the TRD to change from a series of alternating riffles and deep pools that provided high-quality salmonid habitat to a largely monotypic run habitat confined between riparian berms (a trapezoid-shaped channel). The loss of alluvial features and diverse riverine habitats reduced the quantity and quality of salmonid habitats and the populations that relied upon them.

*Id*. (emphasis added). Through the TRFES, scientists analyzed the fundamental attributes of an alluvial river and how those attributes could be restored (at least, in part) through carefully managed flow releases. AR 03737-3738. The ultimate goal was to replicate pre-TRD flow patterns to help recover the alluvial river channel morphology and restore fish habitat in the mainstem Trinity. *Id*.

More specifically, the TRFES recommended flows to achieve three primary, flow-related management objectives: (1) releases to provide suitable salmonid spawning and rearing habitat; (2) releases to mimic the spring snowmelt hydrograph; and (3) releases to meet appropriate water-temperature objectives for holding/spawning adult salmonids and outmigrating salmonid smolts. AR 03738-39. To "achieve these management objectives," the TRFES concluded: "Rehabilitation of the mainstem Trinity River and restoration and maintenance of its fishery resources requires (1) increased annual instream volumes and variable reservoir release schedules, (2) fine and coarse sediment management; and (3) mainstem channel rehabilitation." AR 03978 (emphasis added). The areas primarily targeted for restoration were the upper reaches of the mainstem Trinity below Lewiston. AR 03979-81; AR 03986-4002; AR 04016-23. The TRFES also provides specific detail about temperature-

---

[19] The TRFES explains that "alluvial" means "material deposited by running water." AR 03735.

1   related objectives of the recommended flows. AR 03982. The locations at which temperature would be

2   monitored for management purposes are all located at or above the Trinity-Klamath confluence. *Id.*; *see*

3   *also* AR 03797, 04220.

4        The TRROD even goes so far as to explicitly indicate that the TRFES and TRROD "focus on the

5   Trinity River mainstem and Trinity Basin." AR 03017. The TRROD explains its own scope as follows:

6
7            This Record of Decision (ROD) culminates nearly twenty years of
    detailed, scientific efforts, conducted over the course of the past four
    Administrations, and documents the selection of actions determined to be
8   necessary and appropriate to restore and maintain the <u>anadromous fishery
    resources of the Trinity River</u>.

9   AR 03004 (emphasis added).

10       The Final Environmental Impact Statement/Environmental Impact Report prepared in connection

11  with the TRROD ("TRROD FEIS/EIR") addressed "environmental issues, alternatives, and impacts

12  associated with restoration of the *natural production* of *anadromous* fish on the Trinity River

13  *mainstem*." AR 03217 (emphasis <u>in original</u>). The evaluated alternatives of the TRROD FEIS/EIR

14  "focus on the 40 miles of Trinity River mainstem below Lewiston Dam." AR 03224. The stated goal

15  driving the TRROD FEIS/EIR was restoration and maintenance of a "healthy Trinity River <u>mainstem</u>."

16  AR 03220 (emphasis added).

17       In sum, CVPIA § 3406(b)(23) as well as the TRROD and TRFEIS are limited in scope to the

18  Trinity River basin. Therefore, the limits set forth in the TRROD do not limit Federal Defendants'

19  discretion to implement measures outside the Trinity River basin.

20       Plaintiffs argue that because the FARs at least in part benefit the Trinity River fishery, the FARs

21  must be accounted for within the rubric of the TRROD. *See* Doc. 113 at 14, Doc. 125 at 8. There is no

22  dispute that the FARs were designed to aid fish returning to <u>both</u> the Trinity River and the Klamath

23  River basins. AR 00016-17. It is true that CVPIA § 3406(b)(23) called for a restoration program to

24  "meet Federal trust responsibilities to protect the fishery resources of the Hoopa Valley Tribe, and to

25  meet the fishery restoration goals of the [1984 Act]" and that, in turn, the goal of the 1984 Act was to

26  "restor[e] fish and wildlife populations in the Trinity River Basin to a level approximating that which

1    existed immediately before the start of the construction of the Trinity River division." Pub. L. 98-541,

2    Section 1(6). Yet, CVPIA § 3406(b)(23) set up a mechanism for reaching that goal, which included the

3    completion of the TRFES and adoption of measures recommended therein. As detailed above, the

4    TRROD, following the recommendations of the TRFES, implements a program designed to restore, as

5    much as possible, the natural, alluvial nature of the Trinity River mainstem so that the river itself can

6    provide suitable habitat for fish returning to it. The FARs are designed to address the related, but wholly

7    separate need that conditions <u>in the Klamath River delta</u> be of suitable quality so as to avoid a major fish

8    kill that would impact populations of fish returning to both the Trinity River Basin and the Klamath

9    River Basin. The fact that the FARs happen to <u>also</u> contribute to the 1984 Act's goals does not

10   undermine this Court's overall conclusion that the upper limits set by the TRROD do not preclude

11   Federal Defendants' from implementing the FARs.

12          This conclusion is bolstered by the Ninth Circuit's decision in *Westlands*, 376 F.3d 853, which

13   considered the "Statement of Purpose and Need" set forth in the TRROD FEIS/EIR, which reads:

14              The purpose of the proposed action is to restore and maintain the natural
                production of anadromous fish on the Trinity River mainstem downstream
15              of Lewiston Dam.

16              The need for this action results from Congress' (1) mandate that
                diversions of water from the Trinity River to the CVP not be detrimental
17              to Trinity River fish and wildlife resources; (2) finding that construction
                and operation of the TRD has contributed to detrimental effects to habitat
18              and has resulted in drastic reductions in anadromous fish populations; (3)
                finding that restoration of depleted stocks of naturally produced
19              anadromous fish is critical to the dependent tribal, commercial, and sport
                fisheries; and (4) confirmation of the federal trust responsibility to protect
20              tribal fishery resources affected by the TRD.

21   *Id*. at 866. Plaintiffs in *Westlands*, including (obviously) one of the Plaintiffs in the present lawsuit,

22   challenged the Statement of Purpose and Need on the ground that its focus on restoration of the Trinity

23   River mainstem biased decisionmaking "with the sole objective to increase flows to the exclusion of

24   non-flow measures." *Id*. at 867. The Ninth Circuit acknowledged that "[t]he legislation directing the

25   restoration of Trinity River fishery is not limited to the mainstem":

26              The 1984 Act directs federal agencies to restore the anadromous fish

                                                        38

1
2
3
4

> populations of the entire Trinity River basin, including the "tributaries of
> such river below Lewiston Dam and [ ] the south fork of such river." P.L.
> 98-541 § 2(a)(1)(B). The 1992 CVPIA explicitly incorporates these
> directives, contemplating that enactment of its terms would benefit all
> parts of the Trinity River below Lewiston Dam. CVPIA § 3406(b)(23)
> (directing an instream release of water to "meet the fishery restoration
> goals of the Act of October 24, 1984, Public Law 98-541....").

5   *Id*. at 866. Critically for purposes of the present litigation, the Ninth Circuit confirmed that CVPIA §

6   3406(b)(23) and the 1984 Act were limited in scope to the entirety (rather than just the mainstem) of the

7   Trinity River Basin. Even more importantly, the Ninth Circuit confirmed that the TRROD reasonably

8   defined its own objectives more narrowly than those statutes, to focus on restoration of the mainstem

9   Trinity River, rather than the entire Trinity River basin. *See id*. at 867-68. This supports the proposition

10   that by adopting the TRROD flow regime, Federal Defendants did not impose an absolute ceiling on all

11   activities to support the Trinity River fishery, but rather imposed a ceiling on flows designed to restore

12   conditions on the mainstem Trinity River, and, relatedly, on flows designed to meet the goals of the

13   1984 Act. The FARs fall outside the scope of the limitations imposed by the TRROD. (Whether or not

14   Federal Defendants have authority independent of that provided in the 1984 Act and CVPIA §

15   3406(b)(23) to actually <u>implement</u> the FARs is a different question.)

16       Accordingly, a finding that the FARs fall outside the scope of the TRROD does not mean, as

17   Plaintiffs' suggest, that "nothing was resolved by the process and decision required by CVPIA section

18   3406(b)(23)." Doc. 113 at 18. Rather, the TRFES and TRROD affirmatively resolved how much water

19   would be available for the rehabilitation of the mainstem Trinity River and satisfaction of trust

20   obligations to restore the Trinity River fishery. The 2000 TRROD contains a relatively short section

21   entitled "Rationale for Decision" that is worth reviewing in detail:

22
23
24
25
26

> [T]he guiding principles for this decision emanate from various
> Congressional mandates as well as the federal government's trust
> responsibility to the Hoopa Valley and Yurok Indian Tribes. From the
> inception of the TRD, Congress directed this Department to ensure the
> preservation and continued propagation of the Trinity River's fishery
> resources and to divert to the Central Valley only those waters surplus to
> the needs of the Trinity Basin. With the drastic declines in anadromous
> fish and associated habitats following the TRD's construction and
> operations, Congress subsequently passed a series of legislative initiatives

directing the Department to determine and implement flows and other
measures necessary to restore and maintain these populations to levels
which existed prior to the TRD's inception.

These statutory restoration and preservation directives also comport with
the Department's trust responsibility to the Hoopa Valley and Yurok
Tribes. These Tribes have federally recognized fishing rights which
require sufficient water to make their fishing rights meaningful. The
Department has a trust obligation not only to protect these trust assets but
also to make them productive. Thus, the Department must manage these
assets for the benefit of the Tribes so that they can enjoy a meaningful
fishery—for ceremonial, subsistence, and commercial purposes.

Because of the depressed fishery conditions subsequent to the TRD,
however, the Tribes have been increasingly restricted from the enjoyment
of their trust resources.

In light of these obligations, the Service, with vital support from the
Hoopa Valley Tribe, conducted an extensive scientific effort to determine
the appropriate flows and other measures necessary to restore and
maintain the Trinity River's anadromous fishery. In section 3406(b)(23) of
the CVPIA, Congress sought the final resolution of these issues in order to
meet the federal trust responsibility and to meet the goals of prior
legislation, calling for the completion of the scientific efforts initiated by
Secretary Andrus and for the implementation of recommendations, based
on the best available scientific information, regarding permanent instream
fishery flow requirements and TRD operating criteria and procedures
necessary for the restoration and maintenance of the Trinity River
anadromous fishery. These statutory and trust responsibilities form the
basis for the FEIS/EIR's purpose and need for this action—to restore and
maintain the natural production of anadromous fish below the TRD.

***

The best available scientific information indicates that restoring the
attributes associated with a healthy alluvial river—such as alternative bar
sequences, effective sediment transport, and dynamic riparian
communities—will best achieve the restoration and maintenance of
anadromous fish populations in the Trinity River. Restoring these
geomorphic attributes will restore the diverse habitats that salmon and
steelhead need to survive and successfully reproduce. This will in turn
lead to healthier and more sustainable salmonid populations (and other
species) in the Trinity River Basin.

Based on the information and analysis in the FEIS/EIR, full
implementation of the Preferred Alternative is necessary to restore the
diverse fish habitats in the Trinity River below Lewiston Dam. Improved
habitat conditions will in turn benefit rearing and juvenile life stages and
improve juvenile emigration throughout the Trinity system and will also
benefit anadromous species in the lower Klamath River Basin by
providing increased juvenile outmigration flows and lower water
temperature. These improved habitat conditions are expected to result in

40

greater production and substantial increases in anadromous fish populations. Spawner escapement estimates for chinook and coho salmon and steelhead range from 64-74 percent of the Trinity River Restoration Program (TRRP) goals following implementation of the Preferred Alternative--approximately eight times greater than the estimate for the No Action Alternative. These increases in fish numbers are expected to ultimately result in self-sustaining anadromous fish populations in the Trinity River, providing a meaningful, viable fishery for the Hoopa Valley and Yurok Tribes as well as non-Indian fishing interests along the North Coast. For these reasons and others noted elsewhere, the Preferred Alternative represents the appropriate action necessary to restore and maintain the Trinity River's anadromous fishery in accordance with the Department's statutory and trust responsibilities.

AR 03019-03020 (emphasis added). The TRROD further concludes that the chosen alternative "meets these statutory and trust obligations, providing the best means to achieve the restoration objectives while continuing to operate the TRD as an integrated component of the CVP." AR 03027.

In sum, the upper limits set by the TRROD do not constrain the FARs because the FARs are designed to address issues that fall outside the scope of the TRROD's geographical reach. Accordingly, Federal Defendants motion for summary judgment, joined by Defendant Intervenors, is GRANTED as to the distinct issue of whether Reclamation violated the CVPIA § 3406(b)(23) by implementing the FARs; Plaintiffs' cross motion is DENIED as to this issue.

Yet, this does not end the inquiry. All parties ask the Court to summarily adjudicate the broader question of whether Federal Defendants have legal authority to implement the FARs. No party suggests that CVPIA § 3406(b)(23)[20] or the 1984 Act provide such authority. Instead, Federal Defendants and

---

[20] Federal Defendants do point to the following language from the TRROD, asserting that it supports the proposition that Federal Defendants have authority to take action to address conditions on the lower Klamath:

> Nothing in this ROD is intended to preclude watershed restoration and monitoring, provided funding is available, below the confluence of the Trinity and Klamath Rivers. Because the TRFES and ROD focus on the Trinity River mainstem and Trinity Basin, watershed restoration and monitoring that benefit Trinity River fisheries below the confluence of the Trinity and Klamath Rivers may be considered by the Trinity Management Council.

AR 03017. At first glance, this language does seem to support the proposition that Federal Defendants retain authority to make releases to benefit fish below the confluence. But, this passage must be read in context. Elsewhere, the TRROD suggests that "watershed restoration" is limited to activities designed to address erosion resulting from land use practices. AR 03016 ("The Trinity Management Council will guide an upslope watershed restoration program to address the problems of excessive sediment input from many of the tributaries of the Trinity River resulting from land use practices. The watershed protection program of the Preferred Alternative includes road maintenance, road rehabilitation and road decommissioning on

Defendant Intervenors look to the 1955 Act.

## 2. Does the 1955 Act Provide Authorization for the FARs?

Federal Defendants point to section 2 of the 1955 Act as the source of authority to release separately volumes of water to benefit fish downstream of the confluence. Specifically, the EA states:

> The TRD Central Valley Project Act of 1955 (P.L.84-386) provides the principal authorization for implementing the Proposed Action. Specifically, Section 2 of the Act limits the integration of the Trinity River Division with the rest of the Central Valley Project and gives precedence to in-basin needs, including that "the Secretary is authorized and directed to adopt appropriate measures to insure preservation and propagation of fish and wildlife…"

AR 00017. No further analysis or justification for this determination is provided.

Federal Defendants' position, supported by the Yurok and Hoopa, is that this generic authorization to "adopt appropriate measures to insure the preservation and propagation of fish and wildlife" permits releases to improve conditions on the lower Klamath. The parties raise issues in connection with this contention that are various and wide-ranging.

### a. Deference to Federal Defendants' Determination that the 1955 Act Authorized the FARs.

Federal Defendants suggest that in interpreting the language of the 1955 Act, this Court should apply the deferential standard of review articulated in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and its progeny, pursuant to which a court must first determine whether "Congress has directly spoken to the precise question at issue." *Id*. at 842-43. Where "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id*. Where *Chevron* deference applies and Congress did not specifically address the matter, a court "must respect the agency's construction of the statute so long as it is permissible." *FDA v. Brown & Williamson Tobacco Corp*., 529 U.S. 120, 132 (2000).

---

private and public lands within the Trinity River basin below Lewiston Dam, including the South Fork Trinity River basin."). Accordingly, the TRROD language relied upon by Federal Defendants only supports the proposition that Federal Defendants may engage in such land-based activities to address "excessive sediment input" below the confluence.

However, *Chevron* normally only applies in the context of "notice and comment" rulemaking, formal adjudication, or where the agency engages in other comparable procedures indicative of the exercise of delegated authority to make rules carrying the force of law. *United States v. Mead*, 533 U.S. 218, 227 (2001). Federal Defendants suggest, without much enthusiasm, that this is such a situation. There is no support for this assertion. Apart from notice and comment rulemaking and formal adjudication, *Mead* left open the possibility that other procedures for "making law" could qualify for *Chevron* deference. *Id.* at 231-32. For example, *Mead* cited *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 254-57, 263 (1995), which concerned the Comptroller of the Currency's decision to grant an application to sell annuities, in which decision the Comptroller concluded, generally, that national banks had authority to broker annuities. The Comptroller's approval of the application was afforded *Chevron* deference because the Comptroller is charged by Congress with surveillance of the business of banking. *Id.* at 256-57. In contrast, in *Mead* itself, the issuance of a tariff classification ruling by the U.S. Customs Service was not entitled to *Chevron* deference because Congress had not delegated authority to Customs engage in the "legislative type of activity that would naturally bind more than the parties to the ruling...." 533 U.S. at 232. Critically, the Ninth Circuit has interpreted *Mead* as having "placed crucial 'limits on *Chevron* deference owed to administrative practice in applying a statute' [by] clarifying that agency interpretations promulgated in a non-precedential manner are 'beyond the *Chevron* pale.'" *Gracia-Quintero v. Gonzales*, 455 F.3d 1006, 1012 (9th Cir. 2006) (quoting *Mead*, 533 U.S. at 226, 234).[21] Here, Federal Defendants have completely failed to point to any interpretation of the 1955 Act that has been promulgated in a precedential manner and therefore have provided no justification for the application of *Chevron* deference here.[22]

---

[21] Federal Defendants ignore this limit by citing *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1418 (9th Cir. 1990), for the proposition that when an agency is given the discretion to implement a statute, the agency's interpretation of that statute is entitled to Chevron deference. In fact, in *Pyramid Lake* the Ninth Circuit applied *Chevron* only in the context of discussing regulations promulgated under the ESA through notice and comment rulemaking. *Id.*

[22] Federal Defendants also argue that even though the agency's position was not announced as part of a formal rulemaking process, it was done as part of a public process, given that the agency's position was described in the 2012 and 2013 Environmental Assessments, each of which went through a notice and comment process. Doc. 135 at 7 (citing AR 00017 (2013 EA); AR 01180 (2012 EA)). But, like a Solicitor's opinion, an EA is "not a document intended to have the general force of law." Federal Defendants have not identified and the Court cannot locate any support for the proposition that an

Even if *Chevron* deference does not apply, because an agency rule or decision "is not within an

area of express delegation of authority or does not purport to have the force of law, it is entitled to a

measure of deference proportional to its power to persuade, in accordance with the principles set forth in

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)." *Tablada v. Thomas*, 533 F.3d 800, 806 (9th Cir. 2008)

(citing *Mead*, 533 U.S. at 228, 234). Under this level of review, a court should "look to the process the

agency used to arrive at its decision." *Id*. "Among the factors [to be] considered are the interpretation's

thoroughness, rational validity, consistency with prior and subsequent pronouncements, the logic and

expertness' of an agency decision, the care used in reaching the decision, as well as the formality of the

process used." *Id*. (internal citations and quotations omitted). For example, an internal agency guideline

that is "akin to an interpretive rule," but does not require notice and comment, is entitled to a measure of

deference under *Skidmore. Id*.

Although Federal Defendants' determination that the 1955 Act authorizes the FARs was made

within a FONSI/EA which was subject to formal public comment, the specific conclusion at issue is

supported by no reasoning whatsoever, so is not entitled to deference based upon "thoroughness," "logic

and expertness of [the] agency's decision," or "care used in reaching the decision."

Federal Defendants suggest that Reclamation's interpretation of the 1955 Act as providing the

authority for the FARs is entitled to deference because it has been the agency's announced position since

at least 1974. Doc. 135 at 7. Federal Defendants first cite a 1974 opinion by the Office of the Solicitor.

Doc. 125 at 13 (citing July 1, 1974 Solicitor's Opinion, Exh. 3 to Leeper Decl., Doc. 128-3 ("Singer

Opinion")). The Singer Opinion addressed whether TRD operations "might legally be altered to provide

flood control benefits downstream from Trinity and Lewiston Dams." Doc. 128-3 at 1. Reasoning that

the answer to this question would come from the text of the 1955 Act, Assistant Regional Solicitor Rita

Singer concluded that: (1) the primary purpose of the TRD is to "increas[e] the supply of water available

for irrigation and other beneficial uses in the Central Valley of California"; (2) only certain, specified

---

interpretive position set forth in an EA is entitled to Chevron deference.

uses of water benefitting the Trinity Basin are set forth as "exemptions" to that primary purpose; (3) the enumerated exceptions are exclusive; and (4) flood control is not one of those exceptions. *Id.* at 1-2. Nothing in the Singer Opinion touches upon the issue raised here, namely, whether the 1955 Act authorizes "preservation" activities beyond the Trinity Basin, let alone whether any such authorization is in addition to authorization provided in the 1984 Act, passed ten years after the Singer Opinion issued.

Federal Defendants also cite a 1979 Opinion by Leo Krulitz, the Solicitor to the Department of the Interior, addressing a proposed contract with Grasslands Water District ("Grasslands"), which provides water to wildlife refuges in the San Joaquin Valley. Specifically, Solicitor Krulitz addressed "whether the Department [of the Interior] may amend its contract with Grasslands [] to provide that, in critically dry years, the District be accorded equal priority with agricultural contractors." Doc. 51-3 ("Krulitz Opinion"). In reaching the general conclusion that "the allocation of relative shortages or benefits among priorities in any specific situation [is] a discretionary matter within the Secretary's judgment," the Solicitor noted that:

> On occasion the Congress has specifically limited the Secretary's discretion in meeting the general CVP priorities. For example, in authorizing the Trinity River Division of the CVP in 1955, Congress specifically provided that in-basin flows (in excess of statutorily prescribed minimum) determined by the secretary to be necessary to meet in-basin needs take precedence over needs to be served by out-of-basin diversion. *See* Pub. L. No. 84-386, § 2. In that case, Congress' usual direction that the Trinity River Division be integrated into the overall CVP, set forth at the beginning of section 2, is expressly modified by and made subject to the provisos that follow giving specific direction to the Secretary regarding in-basin needs.

This reference is unconvincing. That the 1955 Act gives priority to in-basin flows is undisputed. What remains unclear, even considering the Kruliz and Singer Opinions, is what these Opinions meant by "in basin" (i.e., was "in basin" just restricted to the Trinity Basin or did it extend to the lower Klamath), let alone whether the 1955 Act gives Federal Defendants authority to make releases to improve conditions in the lower Klamath.

What Federal Defendants omit to discuss is a far more relevant reference to the 1955 Act in the TRFES. The first two paragraphs of the Executive Summary state:

When Congress authorized construction of the Trinity River Division (TRD) of the Central Valley Project (CVP) in 1955, the expectation was that surplus water could be exported to the Central Valley without harm to the fish and wildlife resources of the Trinity River. The TRD began operations in 1963, diverting up to 90 percent of the Trinity River's average annual yield at Lewiston, California. Access to 109 river miles of fish habitat and replenishment of coarse sediment from upstream river segments were permanently eliminated by Lewiston and Trinity Dams. Within a decade of completing the TRD, the adverse biological and geomorphic responses to TRD operations were obvious. Riverine habitats below Lewiston Dam degraded and salmon and steelhead populations noticeably declined.

In 1981, the Secretary of the Interior (Secretary) directed that a Trinity River Flow Evaluation (TRFE) study be conducted to determine how to restore the fishery resources of the Trinity River. This report is the product of that TRFE study. <u>It provides recommendations to the Secretary to **fulfill** fish and wildlife protection mandates of the 1955 Act of Congress that authorized the construction of the Trinity River Division of the Central Valley Project</u>, the 1981 Secretarial Decision that directed the U.S. Fish and Wildlife Service to conduct the TRFE, the 1984 Trinity River Basin Fish and Wildlife Management Act, the 1991 Secretarial Decision on Trinity River Flows, the 1992 Central Valley Project Improvement Act, and Federal Tribal trust responsibilities.

AR 03733 (emphasis added). The first few paragraphs of the Chapter 1 of the TREFS provide important

historical context:

In 1955, Congress passed legislation (Public Law (P.L.) 84-386) (1955 Act) authorizing the construction of the Trinity River Division (TRD) of the Central Valley Project (CVP) to divert surplus water from the Trinity River into the Sacramento River. The 1955 Act also specifically authorized and directed the Secretary of the Interior (Secretary) to "... adopt appropriate measures to insure the preservation and propagation of fish and wildlife ..." The U.S. House of Representatives report on the 1955 Act (USHOR, 1955) states:

> . . . *there is available for importation from the Trinity River, water that is surplus to the present and future needs of the Trinity and Klamath River Basins, and that surplus water, in the amount proposed in the Trinity division plan (704,000 acre-feet), can be diverted to the Central Valley without detrimental effect to the fishery resources.*

For the 10 years after the TRD became operational in 1964, an average of 88 percent (1,234 thousand acre-feet (TAF)) of the annual inflow was diverted into the Sacramento River Basin, with releases to the Trinity River ranging from 150 to 250 cubic feet per second (cfs) and a total annual instream volume of 120.5 TAF (TRBFWTF, 1977). These minimum releases were thought, at that time, to be adequate to sustain the

fishery resources of the Trinity River. The releases identified as appropriate to protect the fishery resources below the TRD addressed primarily chinook spawning needs (Moffett and Smith, 1950). These minimum releases, however, did not address the fluvial geomorphic processes that maintain habitat, nor did these minimum releases provide habitat for other species or other life stages of salmonids. Following construction and operation of the TRD, rapid and unexpected changes in the river morphology caused the degradation of fish and wildlife habitat.

Within a decade of completion of the TRD, salmonid populations had noticeably decreased (Hubbel, 1973). Increased flow releases and habitat rehabilitation projects were identified as necessary to restore the fishery resources (TRBFWTF, 1977). On January 14, 1981, Secretary Cecil Andrus issued a Secretarial Decision and supporting documents (1981 Secretarial Decision, Appendix A) that directed the U.S. Fish and Wildlife Service (Service) to conduct the Trinity River Flow Evaluation (TRFE) Study. The mandate of this study was to determine how to restore anadromous fish populations in the Trinity River Basin.

The 1981 Secretarial Decision directed the Service to submit a report summarizing the effects of minimum releases and other actions in restoring Trinity River salmon and steelhead populations. The report was to address habitat availability over a range of instream water volumes (140 TAF to 340 TAF), and the need to maintain, increase, or decrease these volumes. The report was also to recommend specifically what actions should be continued, eliminated, or implemented to mitigate fish population declines attributable to the TRD.

\*\*\*

This report provides recommendations to the Secretary of the Interior designed to ***fulfill*** fish and wildlife protection mandates of the 1955 Act, the 1981 Secretarial Decision, 1984 Trinity River Basin Fish and Wildlife Management Act, 1991 Secretarial Decision, the 1992 Central Valley Project Improvement Act, and the federal trust responsibility to restore and maintain the Trinity River fishery resources

AR 03747 (emphasis added). These passages are strong indicators that the authors of the TRFES, which included the FWS and the Hoopa, believed that the TRFES (and by analogy the resulting TRROD) in fact fulfilled the fish and wildlife protection mandates of the 1955 Act. This is totally at odds with Federal Defendants' current position, and counsels against applying *Skidmore* deference to Federal Defendants' determination about its own legal authority to undertake the FARs, as "consistency with prior and subsequent pronouncements" is one of the *Skidmore* factors.

Under *Skidmore*, the Court must also consider the "rational validity" of Federal Defendant's position. In this case, this means nothing more than undertaking an independent assessment of whether

1   Federal Defendants' interpretation is correct. As discussed below, it is not.

2            b.        **Plain Language.**

3           Any analysis of statutory authority begins with the plain language. *Gwaltney of Smithfield, Ltd.*

4   *v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 56, (1987) ("It is well settled that the starting point for

5   interpreting a statute is the language of the statute itself.") (internal quotation marks and citation

6   omitted); *see also The Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1060 (9th Cir.

7   2003), *amended on reh'g en banc in part sub nom.*, *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 360

8   F.3d 1374 (9th Cir. 2004) ("Canons of statutory construction help give meaning to a statute's words. We

9   begin with the language of the statute."). The 1955 Act provides general authorization to integrate the

10  TRD with other features of the CVP, with the proviso that the Secretary "is authorized and directed to

11  adopt appropriate measures to insure the preservation and propagation of fish and wildlife, including,

12  but not limited to the maintenance of the flow of the Trinity River below the diversion point at not less

13  than one hundred and fifty cubic feet per second...." Pub. L. No. 84-386, 69 Stat. 719, § 2. The

14  "including, but not limited to" language suggests that the maintenance of flow conditions below the

15  "diversion point" (presumably a reference to Lewiston Dam, where diversion from the Trinity River

16  system to the Central Valley takes place, *see* AR 00017) is only one aspect of the Federal Government's

17  authority to "adopt appropriate measures to insure the preservation and propagation of fish and wildlife"

18  in the Trinity Basin. But, the plain language of the 1955 Act does not directly address whether the

19  authorization "to adopt appropriate measures to insure the preservation and propagation of fish and

20  wildlife" extends beyond the Trinity River to include the lower Klamath. In fact, the statutory text's

21  explicit reference to only the Trinity River, <u>as well as the absence of any reference to the Klamath River</u>

22  <u>or Klamath Basin,</u> suggest otherwise. At best, the statutory text is ambiguous as to Federal Defendants'

23  asserted authority.[23]

24  _____

25

26  [23] In addition, the 1955 Act provides that "not less than 50,000 acre-feet shall be released annually from the Trinity Reservoir and made available to Humboldt County and downstream water users." Pub. L. No. 84-386, 69 Stat. 719, § 2. Members of Congress from the Humboldt area wrote to the Secretary of the Interior requesting that the 50,000 AF allocation be put to use

### c.  Statutory Purpose & Context.

"If necessary to discern Congress's intent, [a court] may read statutory terms in light of the purpose of the statute. Thus, the structure and purpose of a statute may also provide guidance in determining the plain meaning of its provisions." *Wilderness*, 353 F.3d 1060-61 (citing *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.")). The stated purpose of the 1955 Act was to integrate the TRD into the CVP "for the principal purpose of increasing the supply of water available for irrigation and other beneficial uses in the Central Valley of California" provided that the "Secretary is authorized and directed to adopt appropriate measures to insure the preservation and propagation of fish and wildlife...."[24] It is unclear whether Congress intended to limit the authorization to preserve and propagate fish and wildlife in Trinity River or whether that authorization was meant to permit acts to preserve and propagate <u>any</u> fish and wildlife impacted by the "principal purpose," namely, integration of the TRD into the CVP to export water to the Central Valley.[25] If the latter interpretation were adopted, it is plausible that the 1955 Act's authorization could include the lower Klamath. However, there is nothing in the statutory text that illuminates whether this is a reasonable interpretation. And, as mentioned above, the statute's explicit reference to only the "Trinity River" suggests otherwise.

---

in supporting the flow augmentation. Doc. 48-6. Federal Defendants agree that the Secretary did not rely on this proviso to support the actions taken in 2012 and 2013, but maintain that the proviso supports the proposition that the geographic scope of the 1955 Act extends beyond the mainstem Trinity River. Doc. 120-1 at 22 n. 10. This argument is unconvincing. The Court takes judicial notice of the fact that Humboldt County encompasses part of the Trinity River mainstem. *See* http://www.humboldtgov.org/DocumentCenter/View/433 (last visited August 23, 2014). Accordingly, the second proviso's reference to making 50,000 acre-feet of water available to "Humboldt County and downstream water users," does not necessarily mean the geographic scope of the 1955 Act extends beyond the Trinity River Basin.

[24] In *Westlands*, the Ninth Circuit described Section 2 of the 1955 Act as "order[ing] the Secretary of the Interior [] to take necessary measures to protect the fishery and wildlife resources of the Trinity River Basin." 376 F.3d at 861 (emphasis added); *see also Westlands Water Dist. v. U.S. Dep't of the Interior*, 275 F.Supp.2d 1157, 1169 (E.D. Cal. 2002) ("Among the purposes of the TRD Act are that the Secretary ... adopt appropriate measures to protect fish and wildlife in the Trinity River basin.") (emphasis added). But, neither the district court or Ninth Circuit rulings in that case considered whether the 1955 Act authorized releases designed to improve conditions for fish in the lower Klamath River.

[25] No party suggests that the 1955 Act provides <u>unlimited</u> authority to take actions to preserve and propagate fish and wildlife. Such an interpretation would be absurd, as, other legal restrictions notwithstanding, what would stop Federal Defendants from using such authority to export water from the TRD to preserve and protect fish outside the Trinity and Klamath Basins. The obvious limitation is provided by the purpose of the statute itself, to integrate the TRD into the CVP, with the proviso to preserve and propagate fish and wildlife impacted by such integration.

49

### d.    Legislative History.

If statutory language is ambiguous, a court may refer to legislative history to discern

Congressional intent. *Tides v. The Boing Co.*, 644 F.3d 809, 814 (9th Cir. 2011). Here, the legislative

history of the 1955 Act suggests that Congress was at least aware of the fact that impacts from the TRD

were not necessarily confined to the Trinity River Basin. The Senate Report recommending passage of

the bill that would become the 1955 Act stated:

> An asset to the Trinity River Basin, <u>as well as to the whole north coastal</u>
> <u>area</u>, are the fishery resources of the Trinity River. The development of the
> Trinity River was planned with a view to maintaining and improving
> fishery conditions. The legislation sets out minimum flows to be
> maintained below the Trinity diversion point and below the Clear Creek
> diversion point, and requires that the project be operated so as to insure the
> preservation and propagation of fish and wildlife.

S. Rep. No. 1154, 84 Cong., 1st Sess. (1955), at 5. The House Report contained similar language. H.R.

Rep. No. 602, 84th Cong., 1st Sess. 4-5 (1955). Yet, these statements fail to clarify the key dispute in

this case: whether the statutory text can be read to permit augmentation flows above and beyond those in

the TRROD. That Congress was aware that the Trinity River fishery was an asset beyond the Trinity

River Basin does not necessarily establish that the 1955 Act was meant to permit action outside of the

Trinity Basin. In fact, a statement from Clyde H. Spencer, regional director of the Bureau for the Central

Valley at the time of an April 16, 1954 Hearing before the House Committee on Interior and Insular

Affairs, stated that planned operations for the TRD "are such that low-water flows throughout the lower

Trinity and Klamath Rivers would be improved, while water would be stored in Trinity Reservoir or

diverted to the Sacramento only when times when large quantities are flowing in the lower Trinity from

other sources." Hearing on H.R. 123 Before the Subcomm. on Irrigation and Reclamation of the Comm.

on Interior and Insular Affairs, 83d Cong. 5 (1954) (statement of Clyde H. Spencer, Regional Director of

U.S. Bureau of Reclamation for Region 2). This suggests that Congress had reason to believe there

would not be any significant impact to flows in the lower Klamath, in which case why would they need

to authorize the Secretary to take action to protect fish and wildlife there?

//

e.      **Related Statutes.**

In interpreting statutory language, a court may also look to other related statutes because "statutes dealing with similar subjects should be interpreted harmoniously." *Tides*, 644 F.3d at 814 (internal quotation marks and citation omitted). One such related statute is the 1984 Act, which directed the Secretary to implement a management program "for the Trinity River Basin designed to restore the fish and wildlife populations ... to the levels approximating those which existed immediately before the start of construction [of the Trinity River Division] and to maintain such levels." Pub. L. No. 98-541, 98 Stat. 2721 at § 2. The 1984 version of the statutory text called for rehabilitation of fish habitat in both the "Trinity River between Lewiston Dam and Weitpec" as well as "in tributaries of such river below Lewiston Dam and in the south fork of such river." *Id*. As explained above, in 1996, Congress reauthorized and amended the 1984 Trinity River Basin Fish and Wildlife Management Act. Pub. L. 104-143, 110 Stat. 1338. The scope of the 1984 Act's rehabilitation mandate was expanded to from its original call to rehabilitate fish habitat in "the Trinity River between Lewiston Dam and Weitchpec" to call for rehabilitation of fish habitat in "the Trinity River between Lewiston Dam and Weitchpec <u>and in the Klamath River downstream of the confluence with the Trinity River</u>." *See id*. at § 3 (new language emphasized). This expansion is an acknowledgement that rehabilitation of fish and wildlife in the Trinity River Basin may require rehabilitation of fish habitat in the lower Klamath River. But, this modification, made in 1996, does not demonstrate anything about Congressional intent with respect to the 1955 Act.[26]

In 1986, Congress enacted the Klamath River Basin Conservation Restoration Area Act, 16 U.S.C. §§ 460ss *et seq*., Pub. L. No. 99-552, 102 Stat. 3830, finding "the Secretary has the authority to implement a restoration program only in the Trinity River Basin and needs additional authority to implement a restoration program in cooperation with State and local governments to restore anadromous fish populations to optimum levels in both the Klamath and Trinity River Basins." 16 U.S.C. § 460ss(9).

---

[26] It is somewhat unclear why Federal Defendants did not rely upon the 1996 Reauthorization of the 1984 Act as authority to make the releases in question, although it may have something to do with the legal uncertainty surrounding the close connection between the 1984 Act, CVPIA § 3406(b)(23), and the TRROD.

Plaintiffs argue that this finding undermines Federal Defendants' position that the 1955 Act permits actions to restore conditions in the lower Klamath, because if the 1955 Act already provided such authority, why would more authority be needed? *See* Doc. 125 at 12.

The Hoopa rejoin that the 1986 Act's finding that additional authority was needed to implement a "restoration program" in the Klamath Basin was similar to language in the 1984 Act finding that additional authority was required to implement a "restoration program" in the Trinity Basin. Doc. 133 at 3-5. The Hoopa argue that the 1984 Act was necessary to expand the 1955 Act's mandate to "insure the preservation and propagation of fish and wildlife" to include a "restoration" mandate for the Trinity River, which "restoration mandate would include authorization to restore fish to pre-TRD levels. Likewise, they argue the 1986 Act extended a similar "restoration" mandate to the entirety of the Klamath Basin. As defined by Webster's Dictionary, to "preserve," is "to keep safe from injury, harm, or destruction." "Preserve" is synonymous with "protect." In contrast, "restoration" is "a bringing back to a former position or condition." The Court agrees with the Hoopa that it makes more sense to read the 1986 Act as an expansion of the scope of the mandate from "preservation" to "restoration," rather than an expansion of the Secretary's geographical reach under the 1986 Act. But, finding as much does not resolve whether the 1955 Act's distinct "preservation" mandate provides authority to make releases beyond those provided in the TRROD simply because those releases preserve and protect fish and wildlife.

### f.   Synthesis of Statutory Analysis.

Federal Defendants, as well as the Yurok and Hoopa, maintain that the 1955 Act's authorization to "adopt appropriate measures to insure the preservation and propagation of fish and wildlife" permits releases to improve conditions on the lower Klamath. They maintain that the 1955 Act was never repealed by the 1984 Act and that its more generic language and focus on "preservation and propagation" distinguishes it sufficiently from the 1984 Act so as to permit Federal Defendants to utilize it as a justification for releasing water above and beyond the TRROD limits.

As explained above, the plain language of the 1955 Act focuses on the Trinity Basin, says

52

nothing about the Klamath River, and does not address whether the 1955 Act provides the Secretary authority to act beyond the Trinity Basin. An examination of the purpose of the 1955 Act reveals that its primary purpose is to integrate the TRD into the CVP. Logically, then, the proviso in question was put in place to address any impacts to fish and wildlife from that integration. The 1984 Act likewise focuses on the Trinity Basin, not on the Klamath Basin.

Presumably because the TRROD is the culmination of Congressional commands contained in CVPIA § 3406(b)(23), which incorporates by reference the restoration goals of the 1984 Act, no party argues that either CVPIA § 3206(b)(23) or the 1984 Act authorized the 2013 FARs. The Court believes that the TRFES, a document authored by FWS, a branch of Interior, and the Hoopa, contains the most logical explanation for the one major distinction between the 1984 Act and the 1955 Act: the shift from the language of "preservation" to the language of "restoration." That explanation is simple: Congress and all involved learned from experience that the minimum instream flow authorized in the 1955 Act was not enough; restoration was necessary. Critically, the Court agrees with the logic set forth in the TRFES that the TRFES itself (and the resulting TRROD) represent the culmination and embodiment of the Secretary's responsibilities under the 1955 Act, the 1984 Act, and CVPIA § 3406(b)(23). The Court acknowledges that the TRFES may not have been intended as a formal statement of agency opinion as to the interpretation of these laws. Accordingly, the Court is not "deferring" to the agency opinion in the TRFES, merely citing it as the only document in the record that contains a cogent and logical way to reconcile all of the statutory commands at issue in this case. There is simply no logical support for an alternative interpretation of the 1955 Act that affords Federal Defendants authority beyond that set forth in the 1984 Act and CVPIA § 3406(b)(23).

Accordingly, the Court finds that the 1955 Act is limited in geographical scope to the Trinity River basin and therefore does not provide Federal Defendants with authority to implement the FARs, which were designed to improve fisheries conditions in the lower Klamath River.

Plaintiffs' motion for summary judgment that the 1955 Act does not provide legal authority to implement the FARs is GRANTED; Defendants' cross motions are DENIED.

### 3. Tribal Trust Obligations.

Defendant Intervenors the Hoopa Valley Tribe and the Yurok Tribe also move for summary judgment that Federal Defendants' trust responsibilities to the Tribes provide independent authority for the 2013 FARs. Doc. 118 at 8-10; Doc. 119 at 12-13. Federal Defendants maintain that their tribal trust responsibilities provide "additional support" for the decision to implement the 2013 FARs. Doc. 120-1 at 23; *see also* Doc. 169, Ex. A. Plaintiffs argue that Defendants cannot rely on Tribal trust obligations to justify the 2013 FARs because Federal Defendants did not offer those obligations as a legal justification for the 2013 FARs. Doc. 113 at 19. Agency action must be reviewed on the basis of the record existing at the time of the action, not rationalizations developed for the purposes of litigation. *Am. Textile Manuf. Institute v. Donovan*, 452 U.S. 490, 539 (1981); *Humane Soc'y v. Locke*, 626 F.3d 1040, 1048-50 (9th Cir. 2010) ("[P]ost hoc explanations serve only to underscore the absence of an adequate explanation in the administrative record itself.").

The EA clearly indicates that the 1955 Act is the principal basis for the FARs. AR 00017 ("The TRD Central Valley Project Act of 1955 (P.L. 84-386) provides the principal authorization for implementing the Proposed Action."); *see also* AR 00045-00046. Although trust obligations were not listed as a relevant "legal and statutory authorit[y]" in the EA, the EA did list protection of tribal fishery harvest as one of the "needs for the action." AR 00017; *see also* AR 00009 ("[u]nder the Proposed Action ... the risk to the tribal trust fishery would be expected to decrease..."). The EA also explicitly discussed Indian Trust Assets in a section addressing the "Affected Environment and Environmental Consequences" associated with the Proposed Action and No Action Alternatives. *See* AR 00023. Indian Trust Assets were defined as

> legal interests in assets that are held in trust by the United States Government for federally recognized Indian tribes or individuals. The trust relationship usually stems from a treaty, executive order, or act of Congress. The Secretary of the Interior is the trustee for the United States on behalf of federally recognized Indian tribes. Trust assets may include lands, minerals, and natural resources, as well as hunting, fishing, and water rights. In some cases, ITA may be located off trust land.

AR 00035-36. The EA went on to explain that under the No Action Alternative "if a large scale fish die-

off similar to 2002 were to occur in late summer 2013, regardless of apparent causes, it would be

devastating for the tribal trust fisheries in the Klamath and Trinity Rivers." AR 00036. In contrast, under

the Proposed Action (i.e. the 2013 FARs)

> it is expected that the risk of disease vulnerability to the large returning
> run of fall Chinook salmon to the lower Klamath River in the late summer
> would be decreased, relative to the No Action Alternative. In turn, the risk
> to the tribal trust fishery would be expected to decrease.

*Id*.

However, in response to the Court's request for clarification of the Government's position, Doc.

140, Federal Defendants indicated that they relied upon the federal trust responsibility as

"complementary authority" for the decision to implement the FARs. Doc.169, Ex. A at 1. Federal

Defendants specifically reserved their position on whether the trust responsibility might provide an

independent basis for such an action "in some other case." *Id*. In light of the above conclusion that the

1955 Act does not provide authority for the FARs, Federal Defendants' refusal to invoke the trust

responsibility as an independent basis for the action renders the action without legal support.

The Yurok point to cases in which courts have accepted post hoc rationalizations for agency

action. Doc. 134 at 6 (citing *Mass. Tr. of E. Gas and Fuel Assocs. v. United States*, 377 U.S. 235, 247-48

(1964) (holding that even though an administrative body's stated basis of authority was in error, it

maintained the requisite authority such that the error would have no bearing on the substance of the

decision and remand was not appropriate); *NLRB v. Wyman-Gordon Co*., 394 U.S. 759, 766 n.6 (1969)

(describing remand as a useless formality where the agency's substantive basis was not seriously

contestable)). These cases are simply inapposite in the present circumstances, where the defendant

agency affirmatively refuses to invoke the rationalization as an alternative basis for its action. In such a

case, it is inappropriate for the Court to assume the contrary. Accordingly, it is not appropriate for the

Court to address the parties' competing contentions on the merits of the trust issue.

**D.     CVPIA § 3406(b)(2).**

The Yurok Tribe points to CVPIA § 3406(b) as an alternative source of authority for the FARs.

Doc. 119 at 10; Doc. 134 at 2-3. CVPIA § 3406(b)(2) directs the Secretary to

> dedicate and manage annually 800,000 acre-feet of Central Valley Project yield for the <u>primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title</u>; to assist the State of California in its efforts to protect the waters of the San Francisco Bay/Sacramento-San Joaquin Delta Estuary; and to help meet such obligations as may be legally imposed upon the Central Valley Project under state or federal law following the date of enactment of this title, including but not limited to additional obligations under the federal Endangered Species Act.

(Emphasis added.) CVPIA § 3406(b)(2) specifically provides that this volume of water "shall be in addition to the quantities needed to implement ... paragraph (23) of this subsection for release to the Trinity River for the purposes of fishery restoration, propagation, and maintenance...." In *San Luis & Delta–Mendota Water Authority v. United States*, 672 F.3d 676 (9th Cir. 2012), the Ninth Circuit read CVPIA § 3406(b)(2) to mean that water counts toward that yield only if it "predominantly contributes to one of the primary purpose programs." *Id*. at 679. In contrast, "Interior retains the discretion not to count other secondary actions, so long as doing so is necessary to give effect to the hierarchy of purposes." *Id*.

The Yurok argue that according to *San Luis'* reading of CVPIA § 3406(b)(2), Federal Defendants are authorized to release water to meet the "secondary purpose" of meeting tribal trust obligations, Doc. 134 at 2, presumably under the rubric of "help[ing] [to] meet such obligations as may be legally imposed upon the [CVP] under state or federal law following the date of enactment of this title."

Federal Defendants do not invoke CVPIA § 3406(b)(2), not even as a post hoc rationalization. The Yurok Tribe argues that even if this is a post hoc rationalization "it does not negate the substance of Reclamation's congressional delegated authority under ... 3406(b). Doc. 134 at 3. The Yurok's position might be more persuasive if the release of water under CVPIA § 3406(b) did not involve a complex system of accounting. That accounting process, which has been the subject of extensive litigation, *see, e.g., San Luis*, 672 F.3d 690-92 (reviewing history of challenges to § 3406(b) accounting), means that the exercise of Federal Defendants' authority under CVPIA § 3406(b)(2) is not a straightforward proposition. The Court cannot (and will not) make determinations as to the applicability of CVPIA §

3406(b)(2) in this vacuum.

**E.   43 U.S.C. § 383**

It is well established that Reclamation must "comply with state water rights law." *In re Consolidated Salmonid Cases*, 791 F. Supp. 2d 802, 918 (E.D. Cal. 2011) (citing 43 U.S.C. § 383; *California v. U.S.*, 438 U.S. 645, 675 (1978)). Specifically, Section 8 of the Reclamation Act of 1902 requires Federal Defendants "to proceed in conformity with" state law "relating to the control, appropriation, use or distribution of water used in irrigation." 43 U.S.C. § 383. California Water Code ("CWC") § 1381 provides that "the issuance of a permit gives the right to take and use water only to the extent and for the purpose allowed in the permit." CWC § 1052(a) provides that the diversion or use of water other than as authorized is a trespass.

Plaintiffs move for summary judgment on their Second Claim for Relief that Reclamation violated 43 U.S.C. §383 because Reclamation's permits to operate the TRD do not allow use of TRD water for instream flow purposes in the lower Klamath River. FAC ¶¶ 84-91; Doc. 113 at 23. The SWRCB is the state entity charged with regulation of California's water resources. CWC § 174. Pursuant to state law, Reclamation obtained permits to operate the TRD in 1959.[27] All parties agree that a permittee must petition the SWRCB to change a point of diversion, place of use, or purpose of use from that which is specified in the permit. CWC § 1701. However, no approval of the SWRCB is needed to bypass water or release it so that it remains in the source for the benefit of fish. SWRCB staff made this clear in a letter to Reclamation in connection with the FARs, stating:

> As the operator of Trinity Dam, Reclamation may bypass water without a change approval, and may release water for various purposes that do not require [SWRCB] approval. Examples of these purposes include releases for dam safety or maintenance, releases made to satisfy nonconsumptive cultural resource needs, or releases made to improve instream conditions for the benefit of aquatic resources.

---

[27] *See In the Matter of Implementation of Water Quality Objectives for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary; A Petition to Change Points of Diversion of the Central Valley Project & the State Water Project in the Southern Delta, and A Petition to Change Places of Use & Purposes of Use of the Central Valley Project*, Cal. State Water Res. Control Bd., D-1641 (revised), (Mar. 15, 2000) at 4, available at http://www.waterboards.ca.gov/waterrights/board_decisions/adopted_orders/decisions/d1600_d1649/wrd1641_1999dec29.pdf.

AR 01165-66 ("Staff Letter"). Plaintiffs correctly point out that the Staff Letter is only advisory and does not constitute a determination by the SWRCB. *See* SWRCB Order WQ 2001-05-CWP, 2001 WL 293726 at *7 (Mar. 7, 2011) ("The Board has designated as precedent only those actions taken by staff pursuant to delegated authority."). But Plaintiffs do not seriously dispute the above-quoted assertion. Although SWRCB staff did not cite the source of the bypass authority, such authority exists under California law. *See, e.g.*, Cal. Fish & Game Code § 5937 (requiring the owner of any dam to "allow sufficient water at all times to pass ... over, around or through the dam, to keep in good condition any fish that may be planted or exist below the dam"). Plaintiffs assert in their reply brief that making the intended use of TRD water in the lower Klamath River would "plainly" not be lawful under California law, *see* Doc. 125 at 23, but cite no authority to undermine the Staff Letter's finding to the contrary, a finding that is supported by at least one provision in the CWC.

Likewise, given that there is California authority for Reclamation to release water from TRD to improve instream conditions for the benefit of aquatic resources (e.g., to prevent a fish die off), the FARs do not run afoul of CWC § 1052(a), which, as described above, provides that the diversion or use of water other than as authorized is a trespass. Nothing in the record suggests the FARs violate California law. Therefore Reclamation's implementation of the FARs does not violate 43 U.S.C. § 383.

It is true that the Staff Letter also concluded that "absent a transfer or other change approved by the [SWRCB], the [SWRCB's Division of Water Rights] cannot consider the bypass and/or release of water for such purposes as a beneficial use unless Reclamation's permitted place of use includes the streams where the water is bypassed and/or released." AR 01166. The Staff Letter Continued:

> If Reclamation is concerned that its Trinity River permits do not cover the place of use for the planned salmonid protection activities, in addition to a Water Code section 1707 Petition, Reclamation should consider filing a Petition for Change of Place of Use pursuant to Water Code section 1701. [¶] An appropriative water right grants the right holder permission to divert and make beneficial use of surface water. Diversion and subsequent beneficial use are subject to water availability, which will vary depending on natural conditions. Unless required by specific conditions, a water right holder is not obligated to divert water merely by possession of a water right. However, a decision to not divert water or failure to put water to beneficial use for a period of five years may result in reversion of the

water to the public and result in partial or total revocation of the water
right. (Wat. Code, § 1241.)

*Id*. (emphasis added).

Plaintiffs read this language as a warning to Reclamation that failure to obtain a transfer or change approval will necessarily mean that implementing the FARs amounts to a failure to put the bypassed water to beneficial use. Plaintiffs further point out that, under California law, the failure to put water to beneficial use can result in the loss of a right to that water. Pursuant to CWC § 1241:

> If the person entitled to the use of water fails to use beneficially all or any
> part of the water claimed by him or her, for which a right of use has
> vested, for the purpose for which it was appropriated or adjudicated, for a
> period of five years, that unused water may revert to the public and shall,
> if reverted, be regarded as unappropriated public water. That reversion
> shall occur upon a finding by the board following notice to the permittee.

But, Plaintiffs fail to acknowledge that CWC § 1241 assigns to the SWRCB the duty of making a finding of abandonment, and that this finding may only be made after the permittee fails to put the water to beneficial use for a period of five years. The text of CWC § 1241 itself confirms that a temporary failure to put water to beneficial use is not automatically an abandonment.[28] Plaintiffs do not argue and nothing in the record indicates that Reclamation's conduct amounts to an abandonment.

In sum, Plaintiffs have failed to establish that Federal Defendants have failed to "to proceed in conformity with" state law "relating to the control, appropriation, use or distribution of water used in irrigation." 43 U.S.C. § 383. Accordingly, Plaintiffs' motion for summary judgment on their claim that Reclamation's implementation of the FARs violated 43 U.S.C. § 383 is DENIED; Defendants' cross-motion is GRANTED.

**F.   CVPIA § 3411(a).**

Plaintiffs' Second Claim for Relief also asserts that implementation of the 2013 FARs violated CVPIA § 3411(a), Doc. 113 at 21, which provides in relevant part:

> …the Secretary shall, prior to the reallocation of water from any…place of

---

[28] It does not appear Plaintiffs are arguing that Reclamation abandoned any portion of its TRD water right. Whether federal law prohibits Reclamation from abandoning a CVP water right is a question that is not properly before the Court.

use specified within applicable Central Valley Project water rights permits and licenses to a...place of use not specified within said permits and licenses, obtain a modification in those permits and licenses, in a manner consistent with provisions of applicable State law, to allow such change in...place of use.

Plaintiffs move for summary judgment that Federal Defendants have violated this independent provision of federal law even if there is no requirement under state law to change the place of use in TRD water rights in order to undertake these releases. Doc. 125 at 20-21. Put another way, Plaintiffs maintain that CVPIA § 3411(a) establishes an independent "requirement under federal law that Reclamation obtain a modification of its CVP water right permits and licenses prior to reallocating water to a place outside the authorized place of use." *Id*. at 21.

The Court notes Federal Defendants' apparent inattention to this argument in its briefing. Federal Defendants argue that the flow augmentation did not violate CVPIA § 3411(a) because the FARs were not "reallocations of water from any purpose of place of use to any other purpose or place of use." Doc. 135 at 15. Rather, Federal Defendants maintain that "[t]hese flows were provided from released or bypasses of water that had not yet been delivered for CVP consumptive uses or other purposes...." *Id*. But, Federal Defendants offer no authority to support these sweeping assertions, and the Court is unable to find any support for the proposition that the approved place/purpose of use set forth in the TRD water rights permits is not implicated at all because the water utilized for the FARs "had not yet been delivered for CVP consumptive uses or other purposes."

Nevertheless, Plaintiffs' assertion ignores the plain language of CVPIA § 3411, which incorporates by reference "provisions of applicable State law." "In short, section 3411(a) restates the requirements of California water law." *Westlands Water Dist. v. Natural Res. Def. Council*, 43 F.3d 457, 461 (9th Cir. 1994). Because no change of place of use permit was required by state law prior to Reclamation's implementation of the FARs, Reclamation did not violate § 3411(a). To find otherwise (i.e., to find that CVPIA § 3411(a) imposes an independent, federal obligation to obtain a change of place of use permit) would upend the well-established principle that Reclamation should proceed in conformity with state law in connection with the appropriation of water. 43 U.S.C. § 383.

Accordingly, Plaintiffs' motion for summary judgment on their claim that Reclamation's implementation of the FARs violated CVPIA § 3411(a) is DENIED; Defendants' cross-motion is GRANTED.

**G.      Public Trust Doctrine & California Fish & Game Code § 5937.**

CDFG argues in its amicus brief that the Flow Augmentation decisions are supported by California's Public Trust Doctrine and California Fish and Game Code § 5937. *See* Doc. 122 at 13-17. The origins of the public trust doctrine were explained by the California Supreme Court in *National Audubon Society v. Superior Court*, 33 Cal. 3d 419 (1983):

> "By the law of nature these things are common to mankind - the air, running water, the sea and consequently the shores of the sea." (Institutes of Justinian 2.1.1.) From this origin in Roman law, the English common law evolved the concept of the public trust, under which the sovereign owns "all of its navigable waterways and the lands lying beneath them 'as trustee of a public trust for the benefit of the people.'" The State of California acquired title as trustee to such lands and waterways upon its admission to the union; from the earliest days its judicial decisions have recognized and enforced the trust obligation.

*Id*. at 433-34 (internal citations and quotations omitted). All entities holding appropriative state water rights, including the Bureau, "hold those rights subject to the trust, and can assert no vested right to use those rights in a manner harmful to the trust." *Id*. at 437. California "has an affirmative duty to take the public trust into account in the planning and allocation of water resources, and to protect public trust uses whenever feasible." *Id*. at 446.

California Fish & Game Code § 5937 codifies one aspect of the public trust doctrine, providing:

> The owner of any dam shall allow sufficient water at all times to pass through a fishway, or in the absence of a fishway, allow sufficient water to pass over, around or through the dam, to keep in good condition any fish that may be planted or exist below the dam.

Cal. Fish & Game Code § 5937; *see also California Trout, Inc. v. State Water Res. Control Bd.*, 207 Cal. App. 3d 585, 626 (1989) ("[S]ection 5937 is a legislative expression of the public trust protecting fish as

trust resources when found below dams.").

CDFG argues that the FARs are "entirely consistent with and implemented these public trust requirements...." Doc. 122 at 14. The Bureau's decision was also consistent with CDFG's own recommendations that flows in the lower Klamath be at a minimum of 2,200 cfs when adult salmon are entering the Klamath River estuary. AR 02538. But, the fact that the FARs are "entirely consistent with" the public trust requirements does not mean they affirmatively authorize the FARs. While it is undisputed that <u>California</u> "has an affirmative duty to take the public trust into account in the planning and allocation of water resources, and to protect public trust uses whenever feasible," *National Audubon*, 33 Cal. 3d at 446, no party has provided any authority to explain how this duty can be automatically (i.e., without formal action from any branch of the California government) transformed into an affirmative authorization for Federal Defendants to take an action that would otherwise not be authorized. While the public trust doctrine is relevant, it is not dispositive of any claim in this case.

**CONCLUSION AND ORDER**

For the reasons set forth above:

(1) Federal Defendants' motion for summary judgment that Plaintiffs' lack standing is GRANTED as to Plaintiffs' ESA claim and DENIED in all other respects; Plaintiffs' cross motion as to standing is DENIED as to the ESA claim and GRANTED in all other respects.

(2) Plaintiffs' NEPA claim is moot.

(3) Federal Defendants' motion for summary judgment is GRANTED as to Plaintiffs' claims brought under the APA that implementation of the 2013 FARs violated 43 U.S.C. § 383 and/or CVPIA § 3411(a); Plaintiffs' cross motion is DENIED as to these claims.

(4) As to Plaintiffs' remaining claim, also brought under the APA, that implementation of the 2013 FARs violated CVPIA § 3406(b)(23), the Court finds (and no party disputes) that the flow prescriptions set forth in the TRROD operate as upper limits on actions within the scope of the TRROD. But, because the scope of CVPIA § 3406(b)(23), which incorporates the goals of the 1984 Act, is limited to the Trinity River basin, and the associated TRROD is lawfully limited in scope to the Trinity River

mainstem, neither CVPIA § 3406(b)(23) nor the TRROD preclude Reclamation from implementing the 2013 FARs, which were designed to improve fisheries conditions on the lower Klamath River. Accordingly, Federal Defendants motion for summary judgment, joined by Defendant Intervenors, is GRANTED as to the distinct issue of whether Reclamation violated the CVPIA § 3406(b)(23) by implementing the FARs; Plaintiffs' cross motion is DENIED as to this issue.

Federal Defendants offer only one independent legal authority for the 2013 FARs: the 1955 Act. The Court finds that the 1955 Act is likewise limited in scope to the Trinity River basin, so does not provide authorization for Federal Defendants to implement the 2013 FARs to benefit fish in the lower Klamath. Therefore, Plaintiffs' motion for summary judgment is GRANTED as to the distinct issue of whether the 1955 Act provided authorization to implement the 2013 FARs; Federal Defendants' cross motion, joined by Defendant Intervenors, on this issue is DENIED.

The question of remedies remains to be addressed. Given that decisions to make FARs are made on an annual basis, the Court believes remand is not likely to be an appropriate remedy, as all of Plaintiffs' claims concern the 2013 FARs. On or before October 17, 2014, the parties are directed to file a joint form of judgment consistent with the above ruling. If there are disputes as to the appropriate remedy/remedies under the APA, the parties may present their competing positions in a joint report filed alongside the proposed judgment.

**SO ORDERED**
**Dated: October 1 2014**

**/s/ Lawrence J. O'Neill**
**United States District Judge**